# Richmond.

## Miller v. Wills & Others.

### November, 18, 1897.

| | |
|---|---|
| 95 | 337 |
| 95 | 441 |
| 95 | 734 |
| 95 | 337 |
| 97 | 437 |
| 95 | 337 |
| 98 | 791 |
| 95 | 337 |
| 99 | 445 |
| 99 | 517 |
| 95 | 337 |
| 105 | 193 |
| 95 | 337 |
| f110 | 93 |
| 110 | 94 |
| f110 | 742 |

1. CHANCERY PRACTICE—*Injunction to Restrain Trespass—When Awarded—Insolvent or Non-resident Trespasser.*—Although a court of equity will not, as a general rule, interpose to prevent a mere trespass, yet if the act done or threatened would be destructive of the substance of the estate, or if repeated acts of wrong are done or threatened, or the injury is or would be irreparable, in fine, whenever the remedy at law is or would be inadequate, a court of equity will enjoin the perpetration of the wrong, and prevent the injury. The insolvency or non-residence of the trespasser is entitled to much weight in determining whether a court of equity will restrain the trespass.

2. CHANCERY JURISDICTION—*Jurisdiction Once Acquired Retained Until Complete Relief Afforded.*—Where a court of equity has properly acquired jurisdiction of a case, it will, in order to prevent a multiplicity of suits, go on to do complete justice, though in doing so it has to try title, or settle boundaries and administer remedies which rightfully pertain to courts of law.

3. VIRGINIA AND TENNESSEE—*Boundary Line.*—The true boundary line between the States of Virginia and Tennessee is a straight line beginning on the top of White Top Mountain where the northeastern corner of Tennessee terminates, and follows a due-west course midway between Walker's line and Henderson's line to the top of the Cumberland Mountain, where the southwestern corner of Virginia terminates. The validity of this line is established by *Virginia v. Tennessee, 148 U. S. 503.*

4. CHANCERY PRACTICE—*Issue Out of Chancery—Disposition of Verdict—Review by Appellate Court.*—A court of equity has the right, in a proper case, to order one or more issues to be tried by a jury either at its own bar or in a court of common law. The issue, except where directed by statute, is a mere incident to the suit in chancery. It is directed merely to satisfy the conscience of the chancellor, and, if he is not satisfied with the verdict, he may set it aside and award a new trial of the issue, or he may disregard it

and proceed to decide the cause without the intervention of another jury. But this discretion of the chancellor, either in awarding the issue in the first instance, or in approving or disregarding the verdict of the jury in response thereto, is a sound judicial discretion, and is subject to review by the appellate court. Where the the evidence relating to the particular fact in dispute is contradictory and evenly balanced it is the peculiar province of a jury to weigh the evidence and decide the issue, and it is error for the chancellor to set aside the verdict.

5. BOUNDARY LINE BETWEEN STATES—*If Res Judicata as to State, Effect on Citizen.*—If the boundary line between two States has been judicially ascertained in a suit between those States so as to be binding on them, it is equally binding on the citizens of those States.

6. RES JUDICATA—*Suits Touching Same Matter—Different Matters—Case at Bar—Boundary Line Between Virginia and Tennessee.*—Where there have been two suits upon the same claim or demand, the judgment or decree in the first suit, if rendered on the merits, constitutes an absolute bar to a subsequent suit. All of those matters which were offered or received, or which might have been offered to sustain the particular claim or demand litigated in the prior suit, and those matters of defence which were presented or which might have been introduced under the issue to defeat such claims are concluded by the judgment or decree in the former suit. But in a second suit between the same parties or their privies upon a different claim or cause of action, the judgment or decree in the first suit, in order to bar the second, must have been rendered between the same parties or their privies, and the point of controversy must have been the same and have been determined on its merits. In the case in judgment the issue is the location upon the ground of the compromise line of 1802 between the States of Virginia and Tennessee, and not the validity of that line which was the issue determined by *Virginia* v. *Tennessee*, 148 U. S. 503.

Argued at Wytheville.    Decided at Richmond.

Appeal from a decree of the Circuit Court of Washington county pronounced January 9, 1896, in a suit in chancery, wherein the appellant was the complainant, and the appellees were the defendants.

*Reversed.*

The opinion states the case.

*White & Penn,* for the appellant.

*Geo. W. Ward, Jr.,* and *Fulkerson, Page & Hurt,* for the appellees.

RIELY, J., delivered the opinion of the court.

It was earnestly insisted on the part of the appellees that a court of equity was without jurisdiction to hear and determine this cause. In this view we cannot concur.

It is very true that a court of equity will not, as a general rule, interpose in the case of a mere naked trespass. There must be something more to call forth its interference. But where the act done or threatened to be done would be destructive of the substance of the estate, or if repeated acts of wrong are done or threatened to be done, or the injury is or would be irreparable, whenever, indeed, the remedy at law is or would be inadequate, a court of equity will put forth its restraining hand and enjoin the perpetration of the wrong and prevent the injury. 3 Pomeroy's Eq. J., sec. 1357; 1 High on Injunctions, (3rd ed.), secs. 697, 702; 2 Story's Eq. J., sec. 928; *Livingston* v. *Livingston,* 6 John. Ch. 497; *Switzer* v. *McCulloch,* 75 Va. 777; and *Rakes* v. *Rustin L., M. and M. Co.,* 22 S. E. 498.

It has accordingly been held, upon the ground of the inadequacy of the remedy at law, that an injunction will lie in the case of a trespass, where the trespasser is pecuniarily irresponsible. 1 High on Injunction, sec. 356; *Musselman* v. *Marquis,* 1 Bush. 463; *Spear* v. *Cutter,* 5 Barb. 486; *Mulry* v. *Norton,* 100 N. Y. 424; *Webb* v. *Harper,* 38 Ga. 641; *Hicks* v. *Compton,* 18 Cal. 206, and *Morgan* v. *Palmer,* 48 N. H. 338. While mere insolvency would not generally be decisive of the right to grant an injunction, it constitutes in particular cases an important element in determining whether the court in the exercise of a sound discretion should award it, for, the trespasser being insolvent, the legal remedy, "though theoretically perfect, would be practically fruitless." And for a similar reason, the non-residence of the trespasser, which is the case

with the appellees here, is justly entitled to much weight in determining the propriety of awarding the injunction, for it would be unjust that a court of equity should turn from its doors a citizen of the State, who has been subjected to aggravated and repeated trespasses, and leave him to seek redress through the precarious remedy of a suit at law in a foreign jurisdiction. See *Green* v. *Campbell*, 55 N. C. 446, and *Richardson* v. *Williams*, 56 N. C. 116.

The bill in the case at bar sets out a *prima facie* case of title in the complainant to the land upon which the acts of trespass, of which complaint was made, were committed, and alleges that the complainants had been in the quiet and undisturbed possession of the land until about three years before, when the defendants, who were citizens of the State of Tennessee, had come upon the land, with force and arms, in order to overcome any resistance, and thrown down his fences, driven their cattle and sheep in large numbers in and upon the grazing and meadow lands, and destroyed his stacks of hay; that from that time on they had greatly annoyed and injured him in the use and enjoyment of his property; and that they had again begun to repeat their acts of trespass by turning their stock into his meadows and destroying his hay, and were committing great depredation and waste upon the land, by cutting and deadening timber, and doing other unlawful acts. The bill, according to settled principles of equity and numerous precedents, presented a proper case for injunction.

And, where a court of equity has properly acquired jurisdiction, it will, in order to prevent a multiplicity of suits, go on to do complete justice, though in doing so it has to try title, or settle boundaries and administer remedies which rightly pertain to courts of law. 1 Pom. Eq. J., sec. 181; *Anderson* v. *Harvey*, 10 Gratt. 386; *McArthur* v. *Clark*, 13 Gratt. 683; *Bettman* v. *Harness*, (W. Va.) 26 S. E. 271; *Miller* v. *L. & N. R. Co.*, 83 Ala. 274, and *DeVeney* v. *Gallagher*, 20 N. J. Eq. 33.

The court awarded the injunction, as prayed for, on April 26, 1892. The answer of the defendants, which was filed at the October term, 1893, of the court, called in question the title of the complainant, and claimed that the lands, upon which he charged that they had so trespassed lay, not within the Commonwealth of Virginia, from which he derived his title, but wholly within the State of Tennessee. Upon the issue thus raised by the answer, a great mass of testimony was taken by the respective parties. Owing to the doubt and uncertainty produced by the conflicting testimony as to the location of the boundary line between the States of Virginia and Tennessee, the court directed the following issues to be tried by a jury:

"First. Does the compromise line of 1802 between the States of Virginia and Tennessee, as located and established by General Joseph Martin, Creed Taylor, and Peter Johnson, commissioners on the part of Virginia, and Moses Fish, General John Sevier, and General George Rutledge, commissioners on the part of Tennessee, lie south or north of the land in controversy?"

"Second. At what point did it actually begin, and in what direction was it actually run and located until it passed west of the land now claimed by complainant, and in controversy in this cause?"

The jury, who were empaneled on the law side of the court, at its next term, to try these issues, after hearing the evidence and arguments of counsel, rendered the following verdict:

"1st. We, the jury, find and decide that the compromise line of 1802-3 runs south of the land in controversy."

"2nd. The jury further find that the point where that line began is on the summit of Pond mountain, and runs due west beyond the land in controversy."

The defendants, upon the rendition of the verdict, moved the court to set it aside, and award them a new trial. The court at its next term, being of opinion that the verdict was against

the weight of the evidence, and that the top of Pond mountain is not the summit of White Top mountain where the compromise line of 1802-3 begins, and that the line runs north instead of south of the land in controversy, set aside the verdict; and, being further of opinion that the land lies wholly within the boundaries of the State of Tennessee and beyond the jurisdiction of the court, dissolved the injunction theretofore awarded the complainant, and dismissed the bill.

The boundary line between the states of Virginia and North Carolina, as prescribed by their chartered rights, begins at Currituck Inlet, and runs a due west course in latitude 36 degrees and 30 minutes north. This line had been partly located by commissioners representing the two states, when, in 1779, Thomas Walker and Daniel Smith were appointed on the part of Virginia, and Richard Henderson and others on the part of North Carolina to extend and mark the boundary line between these states. They were directed to begin where Joshua Fry and Peter Jefferson, commissioners of Virginia, and Daniel Weldon and William Churton, commissioners of North Carolina, who had run a part of the boundary, had ended their work; and if that place was found to be truly in the latitude of 36 degrees 30 minutes north, then to run from thence due west to the Tennessee river, but if it were found to be not truly in that latitude, then to run due north or south, as the case might be, into that latitude, and thence due west to the Tennessee river. The commissioners, being unable to find the place where the previous commissioners had ended their line on Steep Rock Creek, owing, as they supposed, to so much of the timber thereabout being dead, "proceeded to observation," in order to fix upon the spot on Steep Rock Creek where they should begin. Upon taking observation, they ascertained that they were one mile and two hundred and one and a half poles north of the proper latitude. They, therefore, measured off that distance a due south course, and "the beginning of the line was thus fixed to the satisfaction of all." After running from that point to Carter's Valley,

forty-five miles west of Steep Rock Creek, the commissions of North Carolina conceiving that the line was too far south, a disagreement arose between them and the commissioners of Virginia, and, by agreement, they left to the surveyors on each side to observe and fix the latitude. The surveyors decided that they were more than two miles south of the proper latitude, which distance being measured off directly north, the commissioners of North Carolina ran a line east from that place and then extended it west as far as the Cumberland mountains; but the commissioners of Virginia, after going some distance on this line and taking daily observations, became satisfied that the first line was correct, and went back and brought it up from Carter's Valley, and ran and marked it beyond the Cumberland mountains, whence they proceeded to the Tennessee river. The labors of these commissioners thus gave rise to two different locations of the boundary line, between two and three miles apart, the one being known as "Walker's" line, and the other as "Henderson's" line.

In 1791 both the States of Virginia and North Caroina, by legislative enactments, approved "Walker's" line, and declared it to be the true boundary line between them.

In 1789 the State of North Carolina ceded to the United States all the lands situated within the chartered limits of the State "west of a line beginning on the extreme height of the Stone mountain at the place where the Virginia line intersects it"; and in 1796, the territory thus ceded by the State of North Carolina to the United States was, by act of Congress, created a state by the name and title of the State of Tennessee.

In the year 1800 the General Assembly of Virginia passed a joint resolution, which, after reciting the difficulties arising from the existence of the separate lines of Walker and Henderson and recognizing that the adoption by North Carolina of "Walker's" line as the true boundary could only bind her as far as her territorial limits extended on the line of Virginia, and could not affect the territory which North Carolina had pre-

viously ceded to the United States, and from which the State of Tennessee was created, provided for the appointment of three commissioners to meet commissioners to be appointed by the State of Tennessee, and "settle and adjust all differences concerning the said boundary line, and to establish the one or the other of the said lines, as the case may be, or to run any other line which may be agreed on for settling the same." Under this resolution, General Joseph Martin, Creed Taylor, and Peter Johnson were appointed commissioners to represent Virginia, and under a similar act passed by the Legislature of Tennessee in 1801, Moses Fisk, General Sevier, and General George Rutledge were appointed commissioners on the part of Tennessee to the same end.

These commissioners met together, but "not uniting, from the general result of their astronomical observations," to establish either of the former lines called "Walker's" and "Henderson's", unanimously agreed, in order to end all controversy on the subject, "to run a due west line equally distant from both, beginning on the summit of the mountain generally known by the name of the White Top mountain, where the northeastern corner of Tennessee terminates, to the top of the Cumberland mountain, where the southwestern corner of Virginia terminates." They directed the line to be so run by the surveyors, and to be marked with five chops in the form of a diamond, and it was so done. The commissioners made report of their action to the government of their respective States which, in 1803, by appropriate legislative enactments, ratified, confirmed, and established the line so run and marked as the true, certain, and real boundary between the two States.

It thus appears that the compromise line between the States of Virginia and Tennessee is a straight line, and runs a due west course; that it begins on the summit of the White Top mountain where the northeastern corner of the State of Tennessee terminates and follows a due west course to the top of the Cumberland mountain where the southwestern corner of

the State of Virginia terminates; that it lies midway between "Walker's" line and "Henderson's" line, which were also straight lines running east and west upwards of two miles apart; and that it was marked, when run, with five chops in the shape of a diamond. This is the true boundary line between the States of Virginia and Tennessee.

In 1856 the Legislatures of Virginia and Tennessee passed acts, which, after reciting that the boundary line between them was a due west line, but had become indistinct, uncertain, and to some extent unknown by lapse of time and other causes, provided for the appointment of commissioners—two from each State—"to again run and mark the said line," and where the old marks were gone to erect stone monuments, if there was no growing timber, so that the boundary could be readily identified throughout its whole length. Leonidas Baugh and James C. Black were appointed the commissioners on the part of Virginia, and Samuel Milligan and George R. McClellan represented Tennessee. They made a report to the governments of their respective States of their proceedings under their commission, and of the manner in which they had performed the duty assigned to them.

When the commissioners of 1856 met to perform the duty assigned them, they began at the town of Bristol, which was situate on the compromise line of 1802, at a point where there was no controversy as to the location of the line, and from that point they proceeded east, finding the line as marked by the surveyors under the direction of the commissioners of 1802. When they had proceeded as far as Denton's Valley, about fifteen miles east of Bristol, the marked timber on the straight line gave out, as the commissioners supposed, they not being able to find any after a search of several days. While engaged in the search, they learned that there were trees to the north marked like the trees on the line they had been following. Upon making investigation, they discovered a line marked with five chops, running east and west and about one and a half miles

north of the line they had traced east from Bristol. They, therefore, made an offset to the north to get on this line, which they then followed east to a place called Burnt Hill, where it gave out. No marked timber beyond that point, although the country was thickly wooded, except on the summit of "The Divide," where it had been cleared and was under cultivation, could be found, a distance of a mile or more. Nor could the commissioners, where this line gave out, find a marked corner or any change in the appearance of the marks indicating a purpose to establish a corner, or the beginning point of a line.

The commissioners state in their report that "under this perplexing state of facts," they were unable to settle definitely the "northeastern corner of Tennessee" or to establish the beginning point of the line which they were required to trace; that the Virginia commissioners insisted that the line should be extended east from the supposed end of the marked line on Little Mountain to the top of "The Divide," for the reason that it would be but a continuation of the line from Cumberland Gap, which was to that point about midway between "Walker's" and "Henderson's" lines, while the Tennessee commissioners insisted that the northern line as connected by the cross line with the southern should be extended to the summit of "The Divide," because it was the only unbroken and continuously marked line they had found. No conclusive agreement, however, could be reached, and the point of beginning was left an open question.

The report of the commissioners was prompty rejected by the Legislature of Virginia, but ratified and confirmed by that of Tennessee. In the act of Virginia rejecting the report, and in subsequent acts, provision was made for the appointment of other commissioners to re-run and mark the true boundary line, but such action by Virginia met with no response from her sister State.

It was conceded in the argument that if the line as run by the commissioners of 1856 is the correct location of the boun-

dary between Virginia and Tennessee, then the land in contro-
versy is within the State of Tennessee, but that if the marked
line, as traced by the commissioners east from Bristol to the
place where they diverged to the north, and admitted to be the
boundary line to that point, continued on due east, then the
land lies north of it, and is within the State of Virginia.    The
propriety of the decree appealed from depends therefore upon
the fact as to which of these two lines—in so far as they affect
the land in dispute—is the true location of the boundary be-
tween these States.

Before proceeding to consider the testimony of the witnesses
in the cause, we are met at the threshold with a serious doubt
from the record evidence as to the correctness of the offset
made from the marked line, as traced by the commissioners of
1856, from Bristol to the place where they diverged north,
because such offset is directly at variance with the report of the
commissioners of 1802, who established the boundary line, and
described it as a *due west line*.    The offset so made extends
east some fifteen miles from the nothern point of the diver-
gence, and between one and one and a-half miles north of a
straight line extended east from the place where the divergence
to the north was made.    It would seem unreasonable to be
asked to believe that the able and intelligent commissioners of
1802 should have described the line established by them as
running a *due west course*, and failed in so important a matter
to mention the offset, a fact so variant from their report, and
contradictory of their deliberate statement if the offset really
existed.    Nor does any reason anywhere appear why an offset
should have been made, or the straight course departed from.

The correctness of the offset is further rendered doubtful by
the fact that the marked timber on this offset line, after run-
ning east about fifteen miles, wholly gave out, and no trace of
a line, though diligent search was made, could be found east
of that point.    For this, no reason whatever could be assigned,
as the marked timber gave out in an unbroken forest, and where

. it gave out there was not to be found the least indication of a corner. Therefore, the commissioners, as they state in their report, were unable to locate the northeastern corner of Tennessee, and were compelled to leave the point of beginning of the line run by them at its eastern end, "an open question."

And this doubt is strengthened by the admission by the commissioners in their report that the triangular territory formed by the offset in Denton's Valley was always theretofore recognized by the citizens residing therein as included in the State of Virginia, from which they derived their land titles, in which they voted, were taxed, and exercised all the rights of the citizens of that State; and by the admission that the offset line, though plainly marked from the top of Little Mountain westward nearly to the river, and the cross line at Denton's Valley running south 22 degrees west, and connecting the north line and the south line, seem not to have been recognized as the boundary line.

But when we turn to the testimony of the witnesses, there would seem to remain no reasonable doubt of the incorrectness of the offset line. It was abundantly shown that the marked timber on the straight line traced east from Bristol did not give out at the place where the commissioners of 1856 diverged to the north, but that along a straight line traced east from that point, or west from the old State corner on Pond mountain, there are a number of trees still standing, which bear old marks of five chops in the shape of a diamond; that one or more of these trees had been blocked on different occasions, long prior to the present controversy, and the marks examined; and that when examined, the growth of the timber corresponded with the time that had elapsed since the compromise line was run. On the straight line so marked there was proved to be at least one very notable tree, plainly marked with five chops in the shape of a diamond, which tradition, according to the testimony of some very old persons, had always pointed out as being on the compromise line, and had recognized the territory north of it as being in the State of Virginia.

To refute the positive testimony as to the existence of trees so marked along this line, three witnesses only testified that they had examined some of the trees and were of opinion that the marks were not made with an axe, but were wind shakes or bruises. Blocks, however, were taken from the marked trees and produced in evidence before the. jury, by whom they were split open and examined in the presence of the court, and their verdict should be conclusive of the genuineness and age of the marks. Their growth was nature's own evidence, and not susceptible of fabrication or mistake.

It was also shown that the straight line from Bristol, traced east of the point of divergence of the offset to the north, would pass, according to the marked trees, to the summit of Pond mountain, whereon is the old corner long and generally recognized by citizens of Tennessee, as well as of Virginia, as the corner between the States of Virginia, North Carolina and Tennessee; and that if followed west from this corner, it would pass along Main street of the town of Bristol, and thence to the southwestern corner of Virginia on the Cumberland mountain. The northeastern corner of Tennessee, according to the record evidence, is "on the extreme height of the Stone mountain, at the place where the line of Virginia intersects it." It appears from the testimony that what is locally known as the Stone or Pond mountain is a part of a range of mountains known as the White Top mountains. It also further appears that while the compromise line of 1802 is described as beginning "on the summit of the mountains generally known by the name of the White Top mountain," no one, either from Virginia or Tennessee, has ever claimed that the northeastern corner of Tennessee is on the summit proper of the White Top mountain, which is locally known as the Old Field or White Top, and is from three to four miles north of the eastern end of the offset line.

That the straight line is the correct location of the true boundary between the States of Virginia and Tennessee, and that the land in dispute lies within Virginia, there would seem

to be no room for serious doubt.   It corresponds fully with the
description of the compromise line of 1802.   A line that corres-
ponds with it, both in its course and the character of the marks,
should prevail over another line, though likewise marked, that
was at variance with it.   It is also apparent from the evidence
that the straight line would have been followed and adopted by
the commissioners of 1856 as the correct location of the boun-
dary, if they had found the marked trees herein proved to be
still standing, and that they were evidently surprised when the
marked timber upon the straight line they had been following
gave out, as they supposed, and in consequence whereof  they
made the divergence to the north.

"Walker's" and "Henderson's" lines were, as we have seen,
more than two miles apart.   The compromise line of 1802 was
run equally distant from both of them; and the testimony in
this cause shows that the line upon which are the trees bearing
the old marks of five chops in the shape of a diamond, as proved
by witnesses for the appellant, is between a mile and a mile and
a-half south of the offset line, while it was further stated by some
of the witnesses that there is still another line about the same
distance south of the location of the compromise line as con-
tended for by the appellant, which is supposed to be "Walker's"
line.

The jury found that the line contended for by the appellant
was the true location of the boundary between the States of
Virginia and Tennessee, from which it followed that the land in
controversy was situate in Virginia, and belonged to the com-
plainant.

A court of equity has the right to order in a proper case one
or more issues to be tried by a jury, either in a court of common
law, or at its own bar.   The issue, except where it is directed
by statute, is a mere incident to the suit in chancery.   It is di-
rected merely to satisfy the conscience of the chancellor, and if
he is not satisfied with the verdict, he may set it aside and award
a new trial of the issue, or he may disregard it and proceed to

decide the cause without the intervention of another jury.
2 Barton's Ch. Pr. 868; *Lamberts* v. *Cooper*, 29 Gratt. 65; and
*Almond* v. *Wilson*, 75 Va. 626.

While directing an issue to be tried by a jury is a matter of
discretion in a court of equity, it is not, however, a mere arbi-
trary discretion, but such discretion must be exercised upon
sound principles of reason and justice. A mistake in its exer-
cise is a just ground of appeal, and the appellate court will
judge whether such discretion has been soundly exercised in a
given case. *Stanard* v. *Graves*, 2 Call. 369; *Reed* v. *Cline*,
9 Gratt. 136; *Wise* v. *Lamb*, Id. 294; and *Beverly* v. *Walden*,
20 Gratt. 147. And likewise is the action of a court of equity,
in approving the verdict of a jury upon an issue and decreeing
in accordance with it, or in disregarding it and decreeing against
it, equally the subject of review by the appellate tribunal.
*Southall* v. *McKeand*, 1 Wash. 336; *Pleasants* v. *Ross*, Id. 156;
and *Prior* v. *Adams*, 1 Call. 382.

Where a court of equity, in the exercise of a sound judicial
discretion, has, in a proper case, where the evidence relating
to a particular fact in dispute is contradictory and evenly bal-
anced, directed an issue to be tried by a jury, it is the practice,
without good cause for the contrary course, for the chancellor
to abide by the verdict, since it is the peculiar province of a jury
to decide a question of fact arising in a cause, and upon the
weight of the testimony on which it depends.

In *Carter* v. *Campbell*, Gilmer 170, Judge Roane, speaking for
the court, says: "As the chancellor had power in this case to
direct an issue to try the material fact in controversy between
the parties, and there being contrary and conflicting evidence
concerning it, the court is of opinion that it ought to abide by
the verdict found upon that issue."

In *Foushee* v. *Lea*, 4 Call. 279, the court of law, which tried
the issue out of chancery, having certified to the chancellor
"that strong testimony was offered on both sides sufficient to
have established a verdict in a court of law in favor of either

plaintiff or defendant," this court held, upon an appeal, that "the chancellor did right, therefore, in declaring himself satisfied, as the jury were the proper judges of the facts." See also *McRae* v. *Wood,* 1 H. & M. 548; and *Steptoe* v. *Flood,* 31 Gratt. 342.

The evidence in regard to the location of the boundary line was conflicting, and the issues directed by the court were eminently fitted to be submitted to a jury. All the evidence before them on the trial is in the cause, and, while contradictory, it greatly preponderates in favor of the verdict. Indeed, after a careful perusal of the evidence, it is not perceived how the jury could have well come to a different conclusion. We are clearly of opinion that the court should have abided by the verdict, and decreed in accordance with the facts as found by them.

The appellees made the further defence that the offset line as run by the commissioners of 1856 had been judicially declared to be the true location of the boundary between the States of Virginia and Tennessee, and that this matter was now *res judicata.* For this position, the case of *Virginia* v. *Tennessee,* 148 U. S. 503, was relied on.

This defence, though not raised by way of answer or plea, nor made in the court below, yet being relied on here, ought, perhaps, to be duly considered before concluding this opinion.

The true location of the boundary being a matter affecting the territorial jurisdiction of the State, it must be conceded that if the State of Virginia be concluded by the decree made in that case, the appellant, who is one of her citizens, would also be concluded  *Pool* v. *Fleeger,* 11 Peters 185; and *Virginia* v. *Tennessee, supra.*

The case of *Virginia* v. *Tennessee* was a suit brought by the State of Virginia against the State of Tennessee to have the boundary between these two States established anew, upon the ground that the compromise line of 1802 was not run on the parallel of latitude thirty-six degrees and thirty minutes north, which was originally made by their charters the boundary be-

tween the colonies of Virginia and North Carolina, and continued to be the boundary between Virginia and Tennessee, the latter State having been created out of territory formerly constituting a part of North Carolina, but varied from it by running too far north, and not having been consented to by Congress, as required by the Constitution of the United States (Art. I, sec. 10, clause 3), it was null and void. The contention of Tennessee was that the line, as run by the commissioners of 1802, having been ratified by the legislative action of both States, and been recognized and acted upon as the true and real boundary for a period of over eighty-five years, its correctness was not open to contestation at that late day. The issue, therefore, in that case, was whether the line of 1802 was the legal boundary and binding on these States. The Supreme Court held that it was; that by implication it had received the sanction of Congress in various ways, and could not be re-opened. The above was the only issue made, and this the only point decided. Some observations appear in the opinion of the court as to the correctness of the line run by the commissioners of 1856, but this matter was not involved in the case, and what was there said was not necessary to the decision of the issue before the court. The decree of the court, which speaks for itself, shows that the line as located by the commissioners of 1856 was not passed upon, but only the validity of the line as established by the compact of 1803.

There is a marked difference between the effect of a judgment as a bar or estoppel against the prosecution of a second suit upon the same claim or demand, and its effect as an estoppel in another suit between the same parties or their privies upon a different claim or cause of action. In the former case, the judgment or decree, if rendered upon the merits, constitutes an absoute bar to a subsequent suit. All those matters which were offered and received, or which might have been offered to sustain the particular claim or demand litigated in the prior suit, and those matters of defence which were presented, or which

might have been introduced, under the issue to defeat such claim, are concluded by the judgment or decree in the former suit. *Cromwell* v. *County of Sac*, 94 U. S. 351; *Davis* v. *Brown*, Id. 428; *Withers* v. *Sims*, 80 Va. 651. But in order that a judgment or decree may constitute a bar to another suit, it must be rendered in a proceeding between the same parties or their privies, and the point of controversy must be the same in both cases and be determined on its merits. *Hughes* v. *U. S.*, 4 Wall. 236; *Cromwell* v. *County of Sac, supra*; *Russell* v. *Place*, 94 U. S. 606; *Chrisman* v. *Harman*, 29 Gratt. 494; and *Withers* v. *Sims, supra*.

In the case of *Virginia* v. *Tennessee, supra*, the sole issue was as to the validity of the compromise line under the compact of 1803. In the present suit, the sole issue, so far as the doctrine of *res judicata* could have any possible application, is the actual location upon the ground of the compromise line of 1802. The issues are essentially different. The decision in that case in no wise constitutes a bar to the judicial determination of the issue in this case.

The allegations of the bill being, in our opinion, sustained by the testimony in the cause, our conclusion is that the decree appealed from is erroneous. It must, therefore, be reversed, and a decree entered by this court, as should have been done by the court below, perpetuating the injunction awarded the complainant, and adjudging costs against the defendants.

*Reversed.*