# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## GRANVILLE L. FITCHETTE v. CAPE CHARLES BANK, INCORPORATED.

April 22, 1926.

Reheard June 10, 1926.

1. BILLS, NOTES AND CHECKS—*Endorsement—Subsequent Ratification—Issue Out of Chancery—Responsiveness of Verdict of the Jury to the Issues.*— In the instant case, a suit involving complainant's liability as the endorser of a note, the chancellor submitted to the jury the question of whether the signature of the endorser of the note was the genuine signature of the complainant. Evidence dealing with ratification was taken and the jury was instructed as to it, but the finding of the jury was responsive to the issue submitted and the jury made no finding as to ratification, but found that the signature was not the genuine signature of complainant, the alleged endorser. It appeared from the evidence that complainant had admitted the endorsement to a witness, and that the maker of the note had secured complainant against loss. The relations between the families of complainant and the maker of the note were friendly some time after suit had been brought on the note against the endorser. And there was other evidence that complainant endorsed the note or ratified it. The chancellor, notwithstanding the verdict of the jury, entered a decree for defendant.

    *Held:* That the chancellor did not exceed his authority.

2. ISSUES TO THE JURY—*Effect of Verdict Upon an Issue to a Jury Distinguished from a Verdict Rendered on an Issue Devistavit Vel Non.*—A verdict rendered upon the trial of an issue out of chancery stands upon a very different footing from a verdict rendered upon an issue *devistavit vel non*, or in an action at common law—the reason being that in the former case, the issue is a mere incident of the proceedings, intended to satisfy the conscience of the chancellor, who may, therefore, approve the verdict or disregard it altogether, according to what, in his judgment, the law and the evidence in the particular case require.

3. ISSUES TO A JURY—*Verdict—"Satisfy the Conscience of the Chancellor."*—The verdict upon an issue out of chancery must "satisfy the conscience of the chancellor." The phrase "satisfy the conscience of the chancellor" is an elastic expression. Evidence which to one mind is confirmation strong as proof of holy writ may be to another

wholly insufficient and so this statement of the rule generally accepted can never be elaborated into any definite test. Certain it is that the verdict cannot be disregarded and must sometimes be confirmed even though the chancellor believes it to be wrong. Thus where a case is remanded with directions to order an issue to the jury a chancellor cannot set the verdict aside where the evidence is evenly balanced or even where there is grave conflict between witnesses equally credible unless it shocks his sense of right. He can do it where a manifest wrong has been perpetrated. He must, of necessity, weigh the evidence himself and look to all of the attendant circumstances.

## ON REHEARING.

4. Issues to Jury—*When Ordered—Chancellor Ignorant of the Evidence—Case at Bar.*—In the instant case an issue to the jury was directed not on affidavits but by the chancellor on his own motion. At the time the issue was ordered the chancellor "knew nothing in the world of the evidential facts in the case."

   *Held:* That to have ordered an issue in these circumstances was error, but where the verdict of the jury was set aside by the chancellor it was harmless error.

5. Issues to the Jury—*Improperly Ordered—Disregarding the Jury's Verdict.*—If an issue has been improperly directed upon which a verdict has been rendered, it is the duty of the chancellor, notwithstanding the verdict, to set aside the order directing the issue and dispose of the controversy upon all the evidence in the case, including that taken on terms before the jury.

6. Issues to the Jury—*Verdict—When Treated as Conclusive.*—But where the issue has been properly directed and a verdict rendered, it has no force or value except to assist the chancellor in arriving at the merits of the controversy. However, such a verdict ought generally to be treated by the chancellor as conclusive unless there be a good cause for a different course.

7. Issues to the Jury—*Verdict—Course of Chancellor where he Does not Approve Verdict.*—If the chancellor does not approve the verdict and act upon it, he may set it aside and direct another trial of the issue, or he may decide the cause contrary to the verdict, without the aid of another jury. But when the evidence is contradictory and evenly balanced, it is the practice, without good cause for the contrary course, for the chancellor to abide by the verdict of the jury."

8. Issues to the Jury—*Discretion of the Chancellor—Review by Appellate Court.*—While the chancellor has discretion in the matter of directing an issue, it is not to be arbitrarily exercised, and his failure to direct an issue, even without request, as well as his directing one, is the

subject of review; and the appellate court, if of opinion upon examining all the evidence that the chancellor did not properly exercise his discretion in a given case, will correct his error and reverse the case.

9. ISSUES TO THE JURY—*Weight of Finding of the Jury—Review of Chancellor's Action in Setting Aside Verdict.*—It is the ordinary practice for the chancellor to abide by the finding of the jury upon a properly directed issue, but this is not necessarily so. And when the chancellor has decided the case himself, despite the verdict of the jury and contrary to their finding, the appellate court will itself examine the evidence, and if of opinion that the preponderance of the evidence is with the verdict will reverse the decree and enter final decree in accordance with the verdict. But where the clear preponderance of evidence supports the judgment of the chancellor that judgment will be upheld on appeal.

Appeal from a decree of the Circuit Court of Northampton county. Decree for defendant. Complainant appeals.

*Affirmed.*

The opinion states the case.

*Mears & Mears* and *J. Brooks Mapp*, for the appellant.

*Topping & Topping* and *Jas. G. Martin & Bro.*, for the appellee.

HOLT, J., delivered the opinion of the court.

On May 4, 1921, the Eastern Shore Motor Company, Incorporated, by N. Sternberg, treasurer, executed its note for $9,640.00, payable to Cape Charles Bank, Incorporated, due at sixty days. This note was endorsed by G. L. Fitchette.

On April 4, 1921, N. Sternberg executed his note for $2,500.00, payable to Cape Charles Bank, Incorporated, due ninety days after date. Endorsed on the back thereof is "G. L. Fitchette."

Both of these notes were originally made by Sternberg. After the Eastern Shore Motor Company was incorporated the $9,640.00 note was renewed in its name. Sternberg used the proceeds of both of them, and both of them, as they appear in this record, are renewals of preceding obligations and each on its face authorized confession of judgment. Each fell due on July 5, 1921, and was on that date protested for non-payment. Notice of protest properly addressed was at once mailed to the endorsers. Judgments on both of them were confessed on July 6, 1921, and executions issued on that day. The large note was paid by Fitchette on the 1st day of May, 1922. The $2,500.00 note has not been paid at all.

At the second September rules, 1922, this suit was instituted. In the bill it is charged that Fitchette's name on the $2,500.00 note was a forgery and its prayer is that the judgment be set aside. Depositions were taken and on September 18, 1924, the chancellor of his own motion directed an issue out of chancery. The issue being: "Whether or not the signature of G. L. Fitchette as endorser on the note of N. Sternberg dated April 4, 1921_____is the genuine signature of the said Granville L. Fitchette." A jury was impanelled and on September the 19th, following, this verdict was returned: "Upon the issue submitted to us by the within order, we, the jury, find that the endorsement on the note therein mentioned is not the signature of Garnville L. Fitchette." In the issue as framed the name is Granville L. Fitchette and in the verdict returned this name appears as Garnville L. Fitchette. No note has been taken of this variance and it will be dealt with as immaterial. Immediately upon the receipt of this verdict the Cape Charles Bank moved that it be set aside as contrary to the law and evidence

and as being without evidence to support it. This motion was sustained and by final decree the suit was dismissed, the court being of opinion that it was clear from the evidence that G. L. Fitchette not only signed this note, but afterwards ratified his signature. At the jury trial, by agreement, depositions theretofore taken were read and evidence *ore tenus* heard.

Fitchette in his deposition denied that he had ever endorsed this note or had ever ratified any endorsement appearing thereon. He also stated that within about a day after he learned of the judgment he placed the matter in the hands of his attorney, Mr. Mears, with directions to take steps "to knock out the judgment." Mr. Mears' evidence is to the effect that Fitchette claimed that he had never signed this $2,500.00 note and that he desired him to take such steps as might be necessary "to knock it out," but he also said that he did not know anything about the judgment until two or three weeks after it was entered. A number of witnesses testified as to this signature and to the effect that upon examination of it they were of opinion that it was not Fichette's signature. Among them was one, C. S. Malone, who appears to be an expert of considerable experience. In addition, he introduced several witnesses who gravely impeached Sternberg's reputation for truthfulness. The sheriff into whose hands executions on these judgments went said that he was accustomed to go to Mr. Mears for advice, that he did so in this case and was advised to levy on "what stuff he could find belonging to the Eastern Shore Motor Company."

For the bank it appears that Sternberg at one time had great influence over Fitchette who seemed to be willing to do what he advised. Sternberg stated that Fitchette's endorsement was written in his presence and

detailed at length the circumstances under which it was done. Mr. Clayton P. King is cashier of the Farmer's and Merchant's Trust Bank, into which the Cape Charles Bank has been merged, and was cashier of the latter bank when this note was discounted. He said that it was first a collateral note, but that Sternberg afterwards asked that he be permitted to substitute Fitchette's endorsement for the collateral. This was done and the collateral withdrawn. His bank held both of these notes and they were the only notes so held in which either the motor company, Sternberg or Fitchette was interested. When asked if he had ever seen Fitchette endorse them, he replied: "I am not absolutely certain. I know he endorsed one of them and the chances are both." The original $2,500.00 note, which was at that time a collateral note, was first handed to the bank by Fitchette. He never came to the bank after notice of protest and made no direct claim to it that his name was forged.

Mr. Topping, counsel for the bank, testified in part as follows:

"In the spring of 1921, if my recollection serves me correctly, some time after the potato planting season, Mr. Fitchette came to my office in Cape Charles and, while I am not attempting to repeat his conversation verbatim, the substance of it was that he had heard some reports or rumors to the effect that the Eastern Shore Motor Company was not making the progress that it should, and that he had endorsed two notes for Mr.—or Mr. Sternberg had gotten him to endorse two notes for Eastern Shore Motor Company, which were in the Cape Charles Bank and he was very much perturbed about it, in view of this report he had heard. I believe I remember he said he had not even consulted his wife or informed her of his endorsements on those

notes, and that he had been so much disturbed over it that he had not been able to sleep and he said he came to me to find out whether or not these reports about the Eastern Shore Motor Company were true. I told him that I had not heard these reports and I had no personal familiarity with the affairs of the company, but that I had thought it was getting along all right. That I thought so much so that I put some of my money in it, a little of it. And in the course of the same conversation he told me that he had loaned Mr. Sternberg some money, something over $100.00, quite sometime previous to this conversation, and that he was in need of money to buy some mules with and that he wanted Mr. Sternberg to pay him this money. I don't know why he told me this, but I remember I told him that I thought Mr. Sternberg would pay him if he would go to see him. When he left me he said he felt very much better about the situation and told me he was going to see Mr. Sternberg about the payment of this hundred and some dollars he owed him for a loan. I think he told me that he had no evidence of the loan to Mr. Sternberg."

Sternberg has testified that after Fitchette knew about these judgments he took from him two notes, one for $2,500.00 and one for $1,000.00, to secure him from all loss by reason of this endorsement, that these two notes were delivered by him to Mr. Floyd, Fitchette's father-in-law, and are still held by Fitchette.

On October 21, 1921, three and one-half months after this judgment was obtained, Mrs. Fitchette wrote to Mrs. Sternberg the following letter:

"BRIDGETOWN, VA., *Oct. 21, 1921.*
"MY DEAR MRS. STERNBERG:
"Have been intending to write to you for a long time.

Mama and I fully intended to go to see you the day we were over there but we found we didn't have the time after the crowd decided to come back on the first boat. I want you and your dear mother to come over this week or next and spend a week with me. I may go back with you if it will be convenient. At last I feel like I have gotten straight down here. Have stayed home and worked hard to get things fixed like I wanted them. Am feeling fine and really feel like house keeping once again. Have felt good since the latter part of the summer. I think the first time for nearly three years. Am so fat you wouldn't know me, but it is good I reckon. Hope so any how, for Flora nearly killed me, so I think I should have a long rest. Haven't gotten water put in yet but hope to next year if we make any money. The house has been painted white with green roof and green blinds. The work was started before I carried Flora to the hospital and in fact before potatoes were reaped or I don't suppose it would have gotten done. I was so disappointed when I found Mr. Sternberg didn't come back with Granville yesterday. That makes the third time I have fried chicken for him, also had some real large oysters especially for him. As nice as we have always been to him I do think he might have come. Tell him I feel really hurt over it for I cannot understand why he didn't come. How are the children? You can give Josephine to me. Flora is a lady now and has gotten some flesh and is real tall. Write and let me know if you and Mrs. Frankfurt can come. With love for all.

"As ever,

"INDIA."

[1] It will be observed that the issue submitted to the jury was a narrow one. Is the signature in issue "the

genuine signature of Garnville L. Fitchette?" The jury in reply said that it "is not the genuine signature of Granville L. Fitchette." Evidence dealing with ratification was taken and the jury was instructed as to it, but as a matter of fact its finding was responsive to issue submitted and did not go beyond it. In other words, the jury has made no finding as to ratification.

Reviewing briefly the facts stated, we see that Sternberg had great influence over Fitchette. Sternberg was the active man in the organization of the motor company with no means of his own. Fitchette was putting up the money. The first time this $2,500.00 note was ever heard of it was given to the bank not by Sternberg, but by Fitchette. The proceeds of both notes went the same way—to Sternberg. When this $2,500.00 note was protested Fitchette as endorser was notified on the day of protest. His evidence is that he came to see Mr. Mears within a day after he had notice of judgment. Mr. Mears' evidence is that it was two or three weeks after that date before Fitchette spoke to him about it. It is not reasonable to believe that a man circumstanced as Fitchette was and who had received notice of such liability would wait two or three weeks before consulting counsel. When we look at Mr. Topping's evidence we find that before judgment was confessed Fitchette said to him that he had endorsed two notes for Sternberg, or Sternberg had gotten him to endorse two notes for the Eastern Shore Motor Company, which were in the Cape Charles Bank. The bank has never held any notes except those which have been described. In the beginning the difference between Sternberg and the motor company was of little importance to Fitchette. Indeed, the large note when first executed was executed by Sternberg and not by the motor company, just as the $2,500.00 note was.

There can be no real doubt about the fact that these
are the notes that Fitchette had in mind when he went
to see Mr. Topping.

Moreover, we have the testimony of Sternberg to the
effect that he gave to Floyd, the father-in-law of
Fitchette, after the judgment, notes whose face value
was $3,500.00, to secure him against loss by reason of
his endorsement and the judgment following. It is
true that Sternberg's reputation for truthfulness has
been gravely impeached, but at the trial with this
evidence in the record neither Floyd nor Fitchette, who
were both present, went upon the stand nor undertook
to deny this statement, and finally, we have the letter
of Mrs. Fitchette written three and one-half months
after judgment.

After all, the reasoned judgment of men stands upon
the doctrine of probabilities. We believe those things
that commend themselves to us as inherently probable
and we accept, or should accept, with reservations any
other conclusion. It is not easy to believe that the
cordial relations evidenced by this letter would have
been maintained between these families had Sternberg
perpetrated the gross wrong which Fitchette now
charges.

To what degree is a chancellor bound by the verdict
of the jury on an issue directed by him? The rule is
thus stated in *Reed* v. *Axtell*, 84 Va. 231, 4 S. E. 587.

[2] "This brings us to the consideration of the last
principal assignment of error, which is that the circuit
court erred in setting aside the verdict of the jury, or
rather in disregarding it and in dismissing the petition.
And here it may be well to remark, before commenting
upon the evidence which is made part of the record,
that a verdict rendered upon the trial of an issue out of
chancery stands upon a very different footing from a

verdict rendered upon an issue *devistavit vel non*, or in an action at common law—the reason being that in the former case the issue is a mere incident of the proceedings, intended to satisfy the conscience of the chancellor, who may, therefore, approve the verdict or disregard it altogether, according to what, in his judgment, the law and the evidence in the particular case require. This is a familiar principle repeatedly recognized by this court."

Complainant replies that conceding for the sake of argument the rule thus stated to be the correct one, it applies only when the issue passed on by the jury is a mere incident in the proceedings; citing *Fishburne* v. *Ferguson*, 84 Va. 87, 4 S. E. 575; and *Miller* v. *Wright*, 95 Va. 337, 28 S. E. 337. In the first of these cases Judge Lewis said: "Moreover, in passing on a complaint of errors in the trial of an issue out of chancery, the court proceeds upon very different principles from those governing in an application for a new trial in an action at common law." In the latter the court said: "Where a court of equity, in the exercise of a sound judicial discretion, has, in a proper case, where the evidence relating to a particular fact in dispute is contradictory and evenly balanced, directed an issue to be tried by a jury, it is the practice, without good cause for the contrary course, for the chancellor to abide by the verdict, since it is the peculiar province of a jury to decide a question of fact arising in a cause, and upon the weight of the testimony on which it depends."

There is nothing in the case of *Sacks* v. *Theodore*, 136 Va. 466, 118 S. E. 105, which affects this general rule. The court expressly approved this statement of it made in *Miller* v. *Wright*, *supra*, and said that the verdict in the case in judgment was fully sustained by the evidence.

[3] The verdict must "satisfy the conscience of the chancellor." This, in itself, is an elastic expression. Words oftimes fall into formulae which are but shibboleths to conjure with. Evidence which to one mind is confirmation strong as proof of holy writ may be to another wholly insufficient, and so this statement of the rule generally accepted can never be elaborated into any definite test. Certain it is that the verdict cannot be disregarded and must sometimes be confirmed even though the chancellor believes it to be wrong. To illustrate: *Hook* v. *Hook*, 126 Va. 249, 101 S. E. 223, was heard by one of the judges of this court who sat as chancellor. From his decree an appeal was taken and the Supreme Court of Appeals, after reviewing a mass of evidence, reached the conclusion that there should have been an issue and so ordered. When the cause was again heard it was submitted to a jury upon practically the same evidence theretofore considered by the court. If the jury in that case had reached a judgment which differed from that of the court in the first instance the chancellor would not have been at liberty to set it aside, even though he adhered to his former judgment and would, had he been a member of the jury, have contended for a different verdict. If this were not so then the submission to the jury would have been wholly futile. He cannot set the verdict aside where the evidence is evenly balanced or even where there is grave conflict between witnesses equally credible unless it shocks his sense of right. He can do it where a manifest wrong has been perpetrated. He must, of necessity, weigh the evidence himself and look to all of the attendant circumstances.

The able chancellor in the trial court said in part:

"My conscience is entirely satisfied that he did sign this note; that he ratified it after it was signed, and I

conscientiously and sincerely believe that if I were to refuse to set aside this verdict and to enter up a judgment, and the matter were taken to a higher court for a review, I don't think there could be any other view that the Court of Appeals could take of it than that this court erred in refusing to grant this motion. I approach it, gentlemen, with the utmost reluctance, but being an issue out of chancery, being one of which the ultimate responsibility devolves upon the court, and I regretted many times after the developments began to appear in this case, I regretted that I had put counsel and litigants to the extra trouble and expense of litigating this question before a jury; that I had not decided it myself, because I apprehended even before this jury brought in their verdict that this responsibility was upon me, and I might be called upon to exercise the very responsible duty I now perform."

In this opinion we concur.

The decree of the court below must be affirmed.

*Affirmed*

## ON REHEARING.

Richmond, Va., June 10, 1926.

HOLT, J., delivered the opinion of the court.

This judgment in this cause now being reheard was handed down on April 22, 1926. On the reargument of this case four points were stressed. They will be considered in their order.

1. We found that the $2,500.00 note was first handed to the defendant bank by Fitchette. The evidence relied upon to support that finding appears in the testimony of Mr. King and is as follows:

"Q. Who handed you the original $2,500.00 note?

"A. Mr. Fitchette.

"Q. You don't know anything about his endorsement on the original?

"A. What do you mean?

"Q. Mr. Fitchette's—you didn't see him endorse it the first time?

"A. No."

This seemed sufficient to warrant the finding charged to be erroneous. It is said, however, that the stenographer has written Fitchette when he should have written Fletcher, and that this note was in fact handed to Mr. King, cashier of the defendant bank, by Mr. Fletcher, its president. If this be true it cannot affect the final judgment, the chancellor's decree without it is amply supported.

2. A reexamination of the record confirms us in the conclusion we have drawn from Mr. Topping's testimony. There never were but two notes, one for $9,640.00 and one for $2,500.00, Sternberg in each instance was the maker in the beginning. The larger was afterwards, in renewal form, executed by Eastern Shore Company. Both were endorsed by Fitchette, or purported to have been, and both were held by the bank. Their proceeds went to Sternberg's account and were checked out by him for various purposes. These are the notes that were in Fitchette's mind when he went to consult Topping. This conclusion is inevitable. It was his endorsements that made him anxious.

3. The letter of October 21, 1921, written by Mrs. Fitchette was quoted to show the cordial relation existing between Sternberg and the Fitchette family long after judgment. It is true that Fitchette said to Topping that he had been unable to sleep on account of his endorsements and that even his wife did not know of

them. That attitude we can understand. From the plaintiff's standpoint, however, we are dealing not with an endorsement he wished to conceal but with a gross fraud perpetrated upon him by his former friend Sternberg, which had passed into judgment and was a public record.

[4] 4. The last and major objection is to our confirmation of the chancellor's decree setting aside the jury's verdict and entering final judgment for the defendant. Before taking up this it is proper to look to the manner in which this issue was ordered. It was not done on affidavits but by the chancellor on his own motion. At that time he knew nothing of the facts. Some depositions had been taken but he does not appear to have read them. His statement is: "It is true that the issue out of chancery was formulated at the court's own instance. At that time I knew nothing in the world of the evidential facts in the case." To have ordered an issue in these circumstances was error. It was however harmless.

[5] "If an issue has been improperly directed, upon which a verdict has been rendered, the court, upon the final hearing of the cause, may disregard the finding of the jury, and enter such decree as to it may seem right." Hogg's Equity Pro., section 693; *Bunkley* v. *Commonwealth*, 130 Va. 55, 108 S. E. 1. This is what was done. The chancellor himself has stated no issue should ever have been ordered and his final judgment is fully supported by the evidence. Should we assume that it was properly ordered the result would be the same. It is to be remembered that the evidence is not evenly balanced nor approximately so balanced. The verdict was against its clear weight. In such circumstances the chancellor is free to act. This general proposition is strengthened by the fact that much of the evidence is

in the form of depositions. The jury did not see the witnesses and could not observe their demeanor. Fitchette himself, though in court, did not go upon the stand.

The weight to be given to verdicts on an issue have been the subject of unnumbered decisions in Virginia; they are to satisfy the conscience of the chancellor. It was so stated in *Pleasants* v. *Ross*, 1 Va. (1 Wash.) 156, 1 Am. Dec. 449 and so restated in *Elmore* v. *Producers Asso.*, 145 Va. 42, 132 S. E. 521. In this, the latest case, Judge Chichester took occasion to call attention to the distinction that obtains in issues on pleas and on answers. He said:

"An issue for trial by jury, under this section of the Code, is entirely different from an issue out of chancery under section 6246 of the Code. The granting of an issue under the latter section rests in the sound discretion of the court and its object is to inform the conscience of the chancellor, and he may disregard the verdict or discharge the jury before verdict.

"The object of section 6121 is to determine the issue of fact raised by the plea, and the chancellor has no discretion about awarding the jury trial, and the verdict when rendered stands like any other verdict of a jury where the right to jury trial is given, without discretion on the part of the court, and the verdict cannot be disregarded. Either party may have such an issue tried by a jury. *Towson* v. *Towson*, 126 Va. 640, 102 S. E. 48."

This excellent restatement of the law appears in 1 Barton's Chancery Practice (3rd ed.), page 510:

"*V. Conclusiveness of Verdict.*

"If an issue has been improperly directed upon which a verdict has been rendered, it is the duty of the chan-

cellor, notwithstanding the verdict, to set aside the order directing the issue and dispose of the controversy upon all the evidence in the case, including that taken on terms before the jury.

[6, 7] "But where the issue has been properly directed and a verdict rendered, it has no force or value except to assist the chancellor, in arriving at the merits of the controversy. However, such a verdict ought generally to be treated by the chancellor as conclusive unless there be a good cause for a different course. If the chancellor does not approve the verdict and act upon it, he may set it aside and direct another trial of the issue, or he may decide the cause contrary to the verdict, without the aid of another jury. But in general it may be said that when the evidence is contradictory and evenly balanced, it is the practice, without good cause for the contrary course, for the chancellor to abide by the verdict of the jury."

See also Lile's Eq. Pl. & Prac. page 136; Hogg's Equity Proc., section 693; *Reed* v. *Axtell*, 34 Va. 231, 4 S. E. 587; *Hull* v. *Watts*, 95 Va. page 14, 27 S. E. 829; *Miller* v. *Wills*, 95 Va. page 337, 28 S. E. 337; *Carter* v. *Jeffries*, 110 Va. 735, 67 S. E. 284; and *Sacks* v. *Theodore*, 136 Va. 466, 118 S. E. 105.

The general rule sustained by these authorities had been so often stated that multiplication of citations seems needless. To it there is this well recognized exception: "In directing an issue *devistavit vel non*, the chancellor does not exercise any of the ordinary powers of a court of equity, but acts only in obedience to the express mandate of the statute, the purpose of the issue being to ascertain, by means of a trial by jury, whether or not the will admitted to probate is, in whole or in part, the will of the decedent. When that question has been decided, the function of the suit is exhausted, the

verdict is binding upon the court, and a decree must be entered accordingly, unless for good cause shown the verdict be set aside, either at the trial, or subsequently on a bill of review." Hogg's Eq. Proc., section 694; *Almond* v. *Wilson*, 75 Va. 613.

For the petitioner, *Sacks* v. *Theodore, supra,* is cited and relied upon, but a careful reading of that case demonstrates the fact that it is nowise in point. There the complainant sought by a bill in equity to recover unliquidated damages for breach of an option contract for the sale of land. Equity had no jurisdiction to entertain such a bill and it might have been dismissed. It might have been remanded to the law side of the court as provided for by section 6084, Code of 1919. This the court did not do but summoned a jury to try the issue. Manifestly a verdict there would have been governed by the same rule which would have governed had the jury been summoned on the common law side of the court. It was set aside. When the cause came on to be heard on appeal this court said the chancellor below acted against the weight of the evidence. That he could not do in any case. *Miller* v. *Wills, supra,* was cited to the effect that when evidence was "evenly balanced" the verdict could not be set aside except under unusual circumstances. While there is nothing unusual here the evidence is not "evenly balanced." The verdict was against its clear weight and the chancellor had the right and it was his duty to act as he did.

The more recent Virginia cases seem to establish the following propositions:

[8] While the chancellor has discretion in the matter of directing an issue, it is not to be arbitrarily exercised, and his failure to direct an issue, even without request, as well as his directing one, is the subject of review, and the appellate court, if of opinion, upon examining all the

evidence, that the chancellor did not properly exercise his discretion in a given case, will correct his error and reverse the case.

[9] It is the ordinary practice for the chancellor to abide by the finding of the jury upon a properly directed issue, but this is not necessarily so. And when the chancellor has decided the case himself, despite the verdict of the jury and contrary to their finding, the appellate court will itself examine the evidence, and if of opinion that the preponderance of the evidence is with the verdict will reverse the decree and enter final decree in accordance with the verdict.

In the instant case, as we have seen the clear preponderance of the evidence supported the judgment of the chancellor. We find no error in that judgment, and in the judgment of this court heretofore entered. It is reaffirmed.

*Judgment reaffirmed.*