# Richmond.

## VENABLE & BAYS v. STAMPER.

### NOVEMBER 19, 1903.

#### Absent, Buchanan, J.*

1. SPECIFIC PERFORMANCE—*Contract Indefinite—Case in Judgment—Adequate Remedy at Law.*—A court of equity will not decree the specific performance of a contract to convey a tract of land where the terms of the contract are indefinite. In the case in judgment, an aunt wrote to her nephew in Missouri that if he would return to Virginia she would purchase a farm and live with him, requiring only her board and lodging, and that when she was "done with the farm" would give it to him. The nephew, on the faith of this promise, abandoned a job as a day laborer in Missouri and came to Virginia and married, and entered into the possession of the farm, cultivated it, received all the rents and profits from it, but incurred no costs, made no improvements, and did nothing in respect to it except expend some money and labor upon it in the ordinary course of husbandry. The aunt remained with him less than two years, and then, becoming dissatisfied, left him, and afterwards conveyed the land to another.

*Held*:

If any damage has been shown, it may be compensated in an action at law, and the contract will not be specifically enforced in equity.

Appeal from a decree of the Circuit Court of Lee county, pronounced February 3, 1902, in a suit in chancery wherein the appellee was the complainant, and the appellants were the defendants.

*Reversed.*

The opinion states the case.

---

*Judge Buchanan was detained at home by sickness.

*C. L. Dungan, J. C. Noel* and *Bailey & Byars,* for the appellants.

*Pennington Bros.* and *Bullitt & Kelly,* for the appellee.

KEITH, P.. delivered the opinion of the court.

C. T. Stamper filed his bill in the Circuit Court of Lee county, praying the specific performance of a contract on the part of Minerva Bays, to convey to him a tract of land. The defendant was a woman of about seventy years of age, and the aunt of the plaintiff. She resided in the city of Bristol, and being, as the plaintiff alleges, alone and childless, with no one to comfort or protect her in her declining years, she proposed to him to purchase a farm for his benefit, upon which the aunt and nephew were to live, he to provide her a home and table board as long as she lived. At the time this proposal was made to him, he was living in the State of Missouri, and upon receipt of a letter from her, of date October 18, 1896, he, in the following December, left Missouri, returned to Virginia, and, in March, 1897, took possession of a tract of land which Mrs. Bays had purchased in the meantime, taking a deed for it to herself. His aunt joined him in August of that year, and they continued to live together amicably and agreeably for about eighteen months. At the end of that time, Mrs. Bays found herself much improved in health, and returned to Bristol, saying to her nephew that he could send her provisions as she needed them.

The bill further avers that after Mrs. Bays had remained in Bristol for a short time she was taken sick, and returned to the farm, where she remained for some weeks; that, while she was there, William M. Venable, who was also a nephew of Mrs. Bays, was a frequent visitor; that Mrs. Bays and Venable had many secret conferences, as a result of which she left complainant's house, and has never returned; and that on the second day of March, 1900, Venable induced Mrs. Bays to make a deed to

himself of the farm upon which complainant resides, and also induced Mrs. Bays to make to his wife a deed for all of her property situated in the city of Bristol.

The complainant avers that he has faithfully kept and performed the agreement with Mrs. Bays, by which he was induced to return to Virginia, and that he is now ready, willing and able to perform all the terms and provisions of his contract; that upon the faith of that contract he has made improvements upon the land in the way of fencing and clearing it up, and sowing it in grass, putting money and labor here and there, as occasion required, and that it is impossible for him to estimate the damage he has sustained by reason of the violation of the contract entered into with him by Mrs. Bays, and concludes this portion of his bill with the following language: "At the time he was induced to leave Missouri he was a single man and profitably engaged, and upon the inducements held out to him by Mrs. Bays, was persuaded to change his position and condition in life, and upon the faith of being the owner of the said property, married, that he might be better enabled to carry out his contract in giving Mrs. Bays a home, as he had so contracted. Your orator, therefore, says that it is impossible for his loss to be estimated in damages." He avers that Venable had full notice of his rights in the premises, and his prayer is that W. M. Venable and Minerva Bays be made parties defendant; that Venable be enjoined from prosecuting the action of ejectment, instituted by him for the recovery of this land, until the rights of complainant can be ascertained in the chancery suit; that the deed from Mrs. Bays to Venable be vacated, and that Minerva Bays be compelled to specifically execute the contract entered into by her with complainant.

This bill was answered both by Venable and Minerva Bays, denying all of its material allegations. The proof shows that in October, 1896, Stamper was living in Missouri. We find in his deposition the following questions and answers:

"Q. 8. About how long was it before you came back" (from Missouri) "that you got the last letter from her?

"A. About two weeks.

"Q. 9. In the last letter she wrote you while in Mo., if she made you any proposition concerning your coming back to Va., tell what it was?

"A. She wrote me that if I would come back she would buy the Preston land for me; that she had no health in Bristol, and that she wanted to come to the country to live; that I was the one she wanted to live (with), and that she wanted to do something for me. She said that all she would need off of the place would be her support. Also she said that she would deed it to me.

"Q. 10. Did you answer this letter and accept or reject her proposition, and tell her that you would come back to Va.?

"A. I answered the letter, telling her I would accept her proposition. I told her I would start for Va. as soon as I could get matters in shape to come.

"Q. 11. At the time you received this letter, were you employed by any person; if so, by whom and at what per month?

"A. I was employed at that time by Walter Adamson, my brother-in-law, who paid me eighteen dollars per month, giving me also board, washing, fuel and a horse and buggy when I wanted it; also my clothes mended."

It is unnecessary to refer to this letter, further than to say that it expresses the purpose upon her part to buy the Horton land, and, in the event of Stamper's return, says, "I will do everything I can for you. When I am done with the farm I will give it to you. All I want is my support off the farm." The complainant claims that he received other letters from his aunt, and that the letter just referred to concluded the correspondence between them. No other letter is produced in the record, and, as it was the promise contained in that letter of the

18th of October which induced his return to Virginia, it is unnecessary to consider the vague and unsatisfactory evidence with respect to any other correspondence.

The promise contained in that letter cannot be enforced, because it is wholly indefinite. The promise upon the part of Mrs. Bays to convey to Stamper the land in controversy, after she is done with it, means, if it means anything, a promise that she will make a will in his favor. It is earnestly insisted, however, that he was induced by the promise, whether oral or in writing, to convey this land to him, to change his condition in life, to give up a profitable occupation in Missouri, to return to Virginia and to take possession of the farm and to expend money upon it with the expectation that it would be conveyed to him. It appears from his own testimony that he was engaged in Missouri as a farm hand, at a compensation of $18.00 per month, with board, washing, fuel, and a horse and buggy when he wanted it. He appears to have expended no money upon the farm, except in the ordinary course of husbandry—fencing, cleaning, plowing, sowing and reaping—the only building erected by him being a spring-house. It may be as well to give the evidence upon this point in his own language:

"Q. Since taking possession of said land, what have you done with it?

"A. I have been, and am still, farming it. Have been raising corn, wheat, oats and grass on it. I have sown about ten acres of grass since I have been living on the land. I have done some fencing on it, and cut the bushes and briars off of it every year, except this and one other year. I have built no houses or barns; have built only a spring-house."

The Circuit Court entered a decree, cancelling the deed from Minerva Bays to William M. Venable, dated March 2, 1900, and requiring her to execute and deliver to C. T. Stamper a deed

for the land in controversy. In this we are of opinion the Circuit Court erred.

As was said by this court in *Wright* v. *Pucket,* 22 Gratt. at page 373:

"The statute of frauds was founded in wisdom and sound policy. Its primary object was to prevent the setting up of pretended agreements, and then supporting them by perjury. But beside these direct objects, there is a manifest policy in requiring contracts of so important a nature as the sale and purchase of real estate, to be reduced to writing; since otherwise, from the imperfection of memory, and the honest mistakes of witnesses, it must often happen, either that the specific contract is incapable of exact proof, or that it is unintentionally varied from its original terms. The statute, therefore, requires in contracts of such a nature as are therein mentioned more satisfactory and convincing testimony than mere oral evidence affords. The wisdom of permitting any deviation from the terms of the statute has been questioned by the most eminent chancellors of England and of this country. Courts of equity, however, in their efforts to do complete justice and prevent fraud, have in certain cases relaxed the operation of the statute; and in cases where a parol agreement for the sale of land has been clearly and distinctly proved, and part performance in pursuance of the agreement established, a court of equity will decree specific execution.

"But the principles upon which courts of equity have avoided the statute of frauds, upon the ground of part performance of a part agreement, are now as well settled as any of the acknowledged doctrines of equity jurisprudence. From the numerous decisions on the subject the following principles may be extracted and briefly stated as follows: 1st. The parol agreement relied on must be certain and definite in its terms. 2nd. The acts proved in part performance must refer to, result from,

or be made in pursuance of the agreement proved.   3rd. The agreement must have been so far executed that a refusal of full execution would operate a fraud upon the party, and place him in a situation which does not lie in compensation."

In *Henley* v. *Cottrell,* 101 Va. 70, 43 S. E. 191, the case of *Wright* v. *Pucket* was approved, but specific execution was, in that case, denied, because the acts of part performance, while made in pursuance of the agreement proved, were not considered by the court as being of such a character as to be incapable of compensation in damages if specific execution of the contract were denied.

In this case the plaintiff was a farm laborer in Missouri. He received a letter from his aunt, saying that if he will return to Virginia she will purchase a farm and live with him; that all she will require will be her board and lodging, and that when she is "done with the farm" she will give it to him.   Upon the faith of that promise he returned to Virginia, entered into possession of the farm.   His aunt remains with him for less than two years, becomes dissatisfied and leaves him.   He has, in the meantime, cultivated the farm, received all the rents and profits from it, has incurred no costs, made no improvements, and done nothing with respect to it except the money and labor expended in the ordinary course of husbandry.   In all this we see nothing which cannot be compensated in damages, if indeed any damage can be shown.

We are of opinion, therefore, that the decree of the Circuit Court should be reversed; and this court, entering such decree as the Circuit Court ought to have entered, directs that the bill of complainant be dismissed.

*Reversed.*