# Richmond.

## CARTER v. JEFFRIES.

March 10, 1910.

Absent, Buchanan and Whittle, JJ.

1. SPECIFIC PERFORMANCE—*Parol Agreement to Sell Land—Case in Judgment.*—In a suit for the specific performance of a parol agreement for the sale of land it must appear that the parol agreement relied on is certain and definite in its terms; that the acts proved in part performance refer to, result from, or were made in pursuance of the agreement proved; and that the ageement has been so far executed that the refusal of full execution will operate as a fraud upon the party, and place him in a situation which does not lie in compensation. In the case in judgment, if it be conceded that the vendor became engaged to and intended to marry the appellee (if he had lived), and that he promised to convey to her the real estate in controversy, still the evidence does not show that the acts of part performance were such as are required, nor that the agreement was so far executed that a refusal of full execution would operate as a fraud upon the appellee, and place her in a situation which does not lie in compensation.

2. ISSUE OUT OF CHANCERY—*Discretion of Chancellor—Appeal—Case in Judgment.*—An issue out of chancery awarded merely to satisfy the conscience of the chancellor is advisory only, and if he is not satisfied with the verdict he may set it aside and award a new trial of the issue, or he may disregard it and proceed to decide the cause without the intervention of another jury. The discretion of the chancellor in awarding an issue, and likewise in approving or disapproving the verdict thereon of the jury, must be exercised upon sound principles of reason and justice, and is subject to review on appeal. In the case in judgment the written evidence is wholly inconsistent with the conclusion reached by the jury, and hence it was error in the trial court to have approved their verdict.

Appeal from a decree of the Circuit Court of Prince William county. Decree for the complainant. Defendant appeals.

*Reversed.*

The opinion states the case.

*Thos. H. Lion* and *John M. Johnson,* for the appellant.

*Walton Moore, Douglas S. Mackall, Jno. C. Gittings* and *Justin M. Chamberlain,* for the appellee.

Keith, P., delivered the opinion of the court.

The appellee, Miss Jeffries, filed a bill in the Circuit Court of Prince William county, in which she states that Thomas T. Carter died on or about the 4th of February, 1906, unmarried and intestate; that he was the apparent owner in fee simple of real property in Prince William county, Va., known as "Idylwild"; that during the summer of 1903 she became acquainted with the decedent, Carter, at which time she resided with her father at their home in Fauquier county; that Carter commenced to pay her attention, which resulted in a proposal of marriage, which she declined, and stated to the decedent as her reason for so doing that her father was getting old and required attention, and it was her duty to care for him and make his home pleasant; that she taught school during the winter and took boarders during the summer as a means of support; that her refusal of Carter in no way affected their friendship, but that he continued to visit her from time to time; that in September, 1903, appellee's health became impaired, and Carter, being aware of that fact, again insisted that she should give up her endeavor to earn a living and marry him, and on the 9th of December wrote to her as follows: "Such generosity and sacrifice calls for a reward, and I admire it, and it should challenge the admiration of your friends and the public. Now I feel like

offering something more substantial than sympathy and admiration. I mean offering to share the burden and help you to pay the rent, if you will let me, if your cousin J. will not. Of course you would feel a delicacy in accepting such an offer as Miss Lilly Jeffries, but as Mrs. C. you would not, so that I think you and I can solve the problem if the busybodies will keep quiet; and so I will now ask if you know of any reason, including the questions of health, age, likes and dislikes, honor and ability to provide, that would interfere with a promise to marry in the near future. I pause now for a reply." That in January, 1904, Carter became more insistent than ever, and added as an additional reason that he was extremely lonely, very desirous of her society, and was concerned in her welfare, renewing his request that she become engaged to him and in this way give him the right to provide for her and her father, and in order to induce her to accept, promised and agreed that if she could find a place that in her opinion would make a suitable home for herself and her father and himself and remove thereto, and would give up her school and other endeavors, and would keep house for them and undertake the care and management of such place, so that he might have the benefit of her companionship and society, and consent to become engaged to marry him in the future, that then and in that event, and in consideration thereof, he would purchase the place for her sole use and benefit and make it over to her. The bill then states that in consequence of such inducement, promise and agreement appellee found such a place as seemed to her suitable for the purposes, being the property of one Miss Louisa Moxley; that she agreed with Miss Moxley about the price and notified the decedent, and thereafter went with the decedent to see Miss Moxley and examined the place, at which time he told Miss Moxley that he desired to purchase the property for appellee. In consequence of this conversation Miss Moxley agreed to meet the decedent in a few days at her lawyer's in Manassas, when and where the purchase of the property was consummated, Carter taking title thereto in his own name;

that afterwards the appellee, in performance of her aforesaid agreement, gave up her school and her other endeavors and moved upon the property, and was placed by the decedent in possession, and did undertake the care and management of the housekeeping and all the duties devolving upon her by virtue of the terms of the aforesaid agreement, and continuously thereafter performed the same, and did assent to become the wife of the decedent in the near future, the date of marriage being from time to time put off until it was finally decided that it should take place in the early spring of 1906; that they were engaged up to the time of the death of Mr. Carter, and from the time of taking possession of said property appellee gave to the decedent her constant care, society and attention, and fully performed the terms of the agreement on her part; that after the terms of the purchase had been arranged and the first deposit had been made it was suggested by Carter that the name of the place be changed from "Idylwild" to "Moxley," in view of the fact that the property had been built by Miss Moxley and maintained as a young ladies' seminary for twenty years, and Miss Moxley was asked by Carter if she had any objection to this being done, at the same time stating that appellee would have to acquiesce as the place was hers; that Miss Moxley having no objection, Carter wrote appellee the following letter on October 3, 1904: "I told Miss M. that I would like to rename the house 'Moxley.' What do you think of it? It will be yours. I enclose you my . . . of contract, which you can return, so keep it until I see you." That prior to her taking possession of the land Carter suggested that if she would sell her household furniture, which she had at her home in Fauquier, as the same was too heavy to move, he would remove all the furniture that he had in his home at Manassas to "Idylwild" and give it to her, and that Carter removed all his furniture to "Idylwild" and purchased other articles of furniture, giving all to her in compliance with his promise, all of which was then placed and still remains in her possession; that desiring to earn sufficient money with which to purchase her

trousseau, appellee stated to Carter that she desired to take several boarders, to which he offered no objection, and in consequence thereof she did take several boarders, among whom was Mr. William Cogan, of Washington, D. C., who became very much attached to the place and desired to purchase it, offering to appellee $2,400 therefor; that Carter suggested that she accept this offer and use the money in the purchase of another place in Prince William county owned by Mr. Washington; that Mr. Cogan was quite insistent that they accept his offer, but appellee never determined to do so, and a discussion having arisen between her and Carter in reference to this matter, on Christmas Day, 1905, Carter stated that he would leave it entirely to her to decide, and in further evidence, as he stated, of the fact that the property belonged to her, he executed and delivered to her in the presence of her father a paper writing made upon a check of the National Bank of Manassas, which is as follows:

"No.                    Manassas, Va., December 25, 1905.
        "THE NATIONAL BANK OF MANASSAS.
    "Pay to the order of——Miss Mary Lilly Jeffries $2,500.00
————Idylwild————dollars.
        (Signed)                "THOS. T. CARTER."

That, notwithstanding these assurances and promises, Carter failed to make and deliver a deed to her, or otherwise confirm her title; that early in February, 1906, he became ill and died on the 4th of that month without making any will or in any way confirming her title to the said property; and therefore she prays that the court may direct the defendant to execute and deliver to her a good and sufficient deed, conveying to her the property described in the bill in fee simple and for other and general relief.

William Carter, the defendant, demurred to and answered this bill. The answer denies each and every ground of equity set up in the bill; that any contract was ever made by Thomas T. Carter by which he purchased the property for the benefit of

complainant or undertook to make her a deed for the same, or
that the acts of part performance upon which she relies were
made in pursuance of any such agreement. The answer charges
that on the 1st day of December, 1904, Thomas T. Carter made
a lease of the land in question to Miss Jeffries and her father,
George W. Jeffries, by which "Idylwild" was rented to them
from December 1, 1904, to December 1, 1905, with the privi-
lege of three years—that is to say, until December 1, 1907—
and that it was in pursuance of this lease, which is copied into
the bill in full, that Miss Jeffries and her father moved to and
took possession of the premises in controversy. This lease is in
writing, under seal, and is signed by Thomas T. Carter, Miss
Jeffries and her father. The answer denies that Miss Jeffries
was persuaded by decedent to give up her school in Fauquier
county, but avers that she gave it up at that particular location,
because the premises she then occupied had been sold, and the
owner required immediate possession, and that it was at her ear-
nest solicitation that "Idylwild" was purchased and leased to
her, and that decedent made his home with her and her father
out of consideration of the friendly feeling he had for complain-
ant and the sympathy which she aroused in him; that while she
was in the occupany of "Idylwild" she continued to teach and to
receive boarders in order to provide for her own maintenance as
she had theretofore done. The answer states that appellee was
no more solicitous in regard to Mr. Carter's well-being than she
was of other boarders at her house.

During the progress of the case in the circuit court issues out
of chancery were awarded as follows:

1. Did Thomas T. Carter, deceased, during his lifetime, and
Lilly Jeffries, the complainant, enter into a contract to marry in
the near future, and did the said Thomas T. Carter purchase the
farm mentioned and described in these proceedings for the com-
plainant in consideration of said contract to marry in the near
future and place the complainant in possession of the same, as
owner thereof, and in order to take possession of said farm and

fulfil said contract to marry in the near future on her part did the said complainant give up her position as teacher and change her situation in life.

2. Did the said complainant and her father, George W. Jeffries, enter into a contract with the said Thos. T. Carter for the lease of said farm and occupy the same as his tenants?

3. Did the said complainant ever make a claim of ownership of the said farm during the lifetime of the said Thos. T. Carter?

Upon the first and third of these issues the jury found in the affirmative, and upon the second in the negative. There was a motion to set aside the verdict, which the court overruled, and entered the decree, granting the relief prayed for in the bill; and the case is before us for review upon an appeal taken from that decree.

In *Wright* v. *Puckett*, 22 Gratt. 370, it is said that in a suit for the specific performance of a parol agreement for the sale of land it must appear that the parol agreement relied on is certain and definite in its terms; that the acts proved in part performance must refer to, result from, or be made in pursuance of the agreement proved; and that the agreement must have been so far executed that a refusal of full execution would operate a fraud upon the party and place him in a situation which does not lie in compensation. This case has been frequently cited and approved. See *Henley* v. *Cottrell Real Estate Co.,* 101 Va. 70, 43 S. E. 191; *Venable, &c.,* v. *Stamper,* 102 Va. 30, 45 S. E. 738.

It may be conceded that Thomas T. Carter became engaged to and intended to marry the appellee. It may be further conceded that he promised to convey to her the real estate in controversy; but the evidence fails to show that the acts proved in part performance referred to, resulted from, or were made in pursuance of the agreement proved, or that the agreement was so far executed that a refusal of full execution would operate as a fraud upon the appellee and place her in a situation which does not lie in compensation.

It is true that the jury have found certain issues, which they were sworn to try, in favor of appellee. They have found that Thomas T. Carter, during his lifetime, and Miss Jeffries, the complainant, did enter into a contract to marry, and that Carter did purchase the farm in consideration of the contract to marry, and did place the complainant in possession of the same as owner thereof; and that, in order to take possession of said farm and fulfil said contract to marry, she did give up her position as teacher and change her situation in life. The jury found that said complainant did make claim of ownership of said farm during the lifetime of said Thos. T. Carter, and that the complainant and her father did not enter into a contract with Thos. T. Carter for the lease of said farm and occupy the same as his tenants. But the verdict of the jury in the case before us, where an issue out of chancery was awarded merely to satisfy the conscience of the chancellor, is advisory only, and if not satisfactory to the court may be wholly disregarded. *Lambert* v. *Cooper,* 29 Gratt. 61.

As was said by this court in *Miller* v. *Wills,* 95 Va. 337, 28 S. E. 337: "A court of equity has the right, in a proper case, to order one or more issues to be tried by a jury, either in a court of common law or at its own bar. The issue, except where it is directed by statute, is a mere incident to the suit in chancery. It is directed merely to satisfy the conscience of the chancellor, and if he is not satisfied with the verdict he may set it aside and award a new trial of the issue, or he may disregard it and proceed to decide the cause without the intervention of another jury. . . . While directing an issue to be tried by a jury is a matter of discretion in a court of equity, it is not, however, a mere arbitrary discretion, but such discretion must be exercised upon sound principles of reason and justice. A mistake in its exercise is a just ground of appeal, and the appellate court will judge whether such discretion has been soundly exercised in a given case. . . . And likewise is the action of a court of equity, in approving the verdict of a jury upon an issue and de-

creeing in accordance with it, or in disregarding it and decreeing against it, equally the subject of review by the appellate tribunal."

In our judgment the written evidence in this case is wholly inconsistent with the conclusion reached by the jury. As we have seen, Carter made a lease of this property to Miss Jeffries and her father by a written instrument under seal and of date December 1, 1904. That they entered and took possession of the property under that lease does not, we think, admit of doubt.

A Mr. Cogan, as we have seen, was desirous of purchasing the farm in controversy, and, as appears from his evidence, entered into negotiations with Mr. Carter upon the subject. He says in his testimony that during the negotiations, which were wholly with Mr. Carter, he saw and talked with him in the presence of Miss Jeffries, and that she never at any time made any claim that the property was hers, except that she stated she had a lease upon it.

On January 28, 1906, she wrote to Mr. Cogan upon the subject as follows:

"Dear Mr. Cogan,—Mr. Carter thinks it best for me to advise you that it may be impossible for us to vacate here in April and perhaps not until fall, as up to this date we have not been able to find a suitable place, either for sale or rent. Mr. Carter and papa have both been on the hunt. I hope this delay, if it must be, will not interfere with the sale of place. I will do my best to find some other place before April, for I do not, as I have said, wish to interfere with the sale of place. If we have ice will fill icehouse as usual, and if I succeed in finding another place will advise you at once. You should not think hard of me for this, as you and Mr. Carter should have come to terms last fall; then I could have rented places that were for rent first of year. At this time it is almost impossible to rent, and Mr. Carter does not want to purchase a place for us that does not suit him. With love to all,

"Very sincerely,
                    "LILLY JEFFRIES."

"I would be glad to have you and Miss Hanna come up any Saturday or Sun., but the rest of the week I am kept very busy with my school."

On January 31, 1906, she wrote Mr. Cogan as follows:

"Dear Sir,—Finding that my father and I cannot rent any suitable place, and not being in a position to buy, we are compelled to remain here under the lease, which is good until December, 1907. When I wrote you I would not interfere with sale of place it was with a view that Mr. Carter would buy elsewhere and rent to us, as he intended about any place, I feel that I am released from my promise. I do not think our refusing to give up this place will be any loss to you, as you have stated Virginia was full of desirable places for sale; many, no doubt, that would suit you better than this; even if I had a place in view it would inconvenience me a thousand times more to move than it would you not to come. Some of my friends have estimated the loss of my moving in spring at $300.00, plus the work and inconvenience. I am at a loss to know how you have lost so much money preparing for the change and all within a period of one week. I am sure you can find a place in a very short time.

"Very truly,

"LILLY JEFFRIES."

"January 31, 1906.

On another piece of paper and enclosed in the same letter there is the following: "Papa wishes me to say that one day shortly after you had written Mr. Ca. not long ago he and Mr. C. were talking of selling and moving, and Mr. C. asked him what he thought of the matter, and papa remarked that he hoped when he came here he would not have to move again, and Mr. C. said, well, that settles it; we will remain here the rest of our days. Of course, papa had in his power to refuse to leave, as he was one of the signers of the lease, and had not been consulted; but he, like I, would have gone to another place with Mr. C. if

he had wished it; we, as the Ellises and many others, know he had fully decided to remain here, and every one thinks he had a right to do so.

(Signed)          "L. J."

Then comes an undated letter to Mr. Cogan:

"Dear Mr. Cogan,—I am glad Mr. Carter has reconsidered his offer. I wished him when he answered your letter not to consider me, as I would not stand in the way of sale of place. True no one could need a hundred dollars more than I, but I am willing to trust to luck. I will also give up my lease which is signed by me for 1906; by doing this you see I am not standing in way of sale, and think you will regret, if you do not buy now, as this is a beautiful home, and have no place in view now, but am very anxious for Mr. C. to sell. Miss Agnes was very unkind to say I was the cause of Mr. C. not selling, and hope you all do not think the same. With best love to all,

"Sincerely,

"LILLY JEFFRIES."

Mr. Carter died on February 4, 1906, and on February 12 of that year Miss Jeffries wrote again to Mr. Cogan:

"I have intended to write you ever since the death of Mr. Carter, as it was his request that I should write to you explaining about the lease and enclose it with his letter, which he intended to write the morning after his death. It worried him to think you doubted his word in regard to our signing lease; he put his name on lease in December, and put it on mantel for papa and I to sign. This I did on 30th of December, and my father being away on a visit to Ethel's, signed it on his return about 5th of January. Mr. C. was not aware of the fact that papa's name was on lease when he wrote, but was glad to know it was, as he did not want to sell Idylwilde, when you offered him $2,400.00, for the reason he would not find another place to suit him, and he did not want the trouble of moving, and when

he wrote you last had fully made up his mind to remain here
the rest of his life, and made this remark in presence of several,
the Saturday before he died; the last letter I wrote you was
written by his dictation in the presence of papa. I did not in-
fluence, and if he could have found a place to suit him better
I would have gone with him, and given up my lease, but he did
not wish to leave here after due consideration; my lease is good
until Dec. 1, 1907, if properly signed, and among his private
papers, which are in the hands of one of his friends; I also have
a copy.    Mr. C's. affairs have never been settled and every-
thing is here just as he left it, except his private papers, which
were given over to his relations the morning after his death.   I
am expecting his attorney any day, who is also a friend of mine,
I having met him through Mr. Carter.   This death was indeed
a great shock to us all, and I feel I have lost my best friend; he
seemed perfectly well the night before he died and he and
papa were singing some old hymns.   On the Saturday before
he and I walked over to Mr. Cockrell's, and he seemed to en-
joy the trip very much; the place does not seem the same with-
out him, as he was always home, and as he said, looking after
things while I was teaching school; he is missed by all that know
him; how much papa and I miss him we can never express.
Papa and Mr. Oscar Ellis, who were the first to see him, think
he died without a struggle.

"Very truly,

"LILLY JEFFRIES."

"I trust none of you will bear Mr. C. any ill will, as he was
doing what he thought best for papa and I, and I was acting
to please him, which I shall continue to do as far as I can."

On February 18, 1906, she again wrote to Mr. Cogan as
follows:

"Dear Mr. Cogan:

"I do not understand what you mean when you say in yours of 15th inst—'I will show the public that I have no fear of being haunted by Mr. Carter's death, as suggested by you in an unsigned communication in your handwritting.' I have never at any time written you without signing my name, or have I ever thought of you as connected with Mr. C.'s death, therefore I do not know what you mean by accusing me of writing the above. I have only written you the one since Mr. C.'s death, and that on the 12th in regard to the lease, which was signed correctly, and by Mr. Carter's request; it has been read by two of our best lawyers and they both say it is all right. One of them wrote lease for Mr. C. and knows all about the signing and his deciding not to sell, as he saw him the Friday before he died. I did not influence Mr. C. to remain here against his will, and can prove all I say. I shall certainly expect you to explain what you mean by accusing me of sending you an unsigned letter. I only wish Mr. Carter could have lived to have written you, then you would not have said I was the cause of this trouble; he would have written you the truth in regard to the whole matter. I am sorry you all think so hard of me, but would rather the blame would rest on me than on one who is gone and cannot defend himself.

"Very truly,

"LILLY JEFFRIES."

Without undertaking further to discuss the evidence we are of opinon, the verdict of the jury to the contrary notwithstanding, that Miss Jeffries and her father did enter into a contract with Mr. Carter for the lease of his farm, and did occupy the same as his tenants. Her own letters show, moreover, that she did not give up her occupation as a teacher, but that she continued to pursue that avocation as a means of support after she had entered upon the leased premises; and, upon the whole

case, we are of opinion that the evidence does not show that the acts relied upon as a part performance of the agreement which she asks to be specifically enforced were done or made in pursuance of that agreement; that the evidence does not show that the agreement set up in her bill has been so far executed that a refusal of full execution would operate as a fraud upon the appellee and place her in a situation which does not lie in compensation.

For these reasons we are of opinion that the decree of the circuit court is erroneous, and must be reversed.

*Reversed.*