## STEINMAN v. CLINCHFIELD COAL CORP.

(Circuit Court of Appeals, Fourth Circuit. February 27, 1917.)

No. 1465.

1. GIFTS ⬤=25—PAROL GIFT INTER VIVOS—DESCRIPTION OF LAND—DEFINITENESS.

The definiteness or reasonable certainty as to the description of the land necessary to make valid a parol gift is relative and may be much less in a wild country where the land has a nominal value than in a city, the definiteness required being that everything of importance to the parties in the effect of the transaction should be expressed in the contract, and a possible variance which the parties themselves would have regarded as unimportant does not defeat the gift.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. §§ 43–48.]

2. GIFTS ⬤=25—PAROL GIFT INTER VIVOS—POSSESSION BY DONEE.

Where a son to whom his father had made a parol gift of part of the home tract built a permanent home thereon, cleared the land to the recognized line, and was using it as his home, there was sufficient notice of his rights as against a subsequent purchaser from the father.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. §§ 43–48.]

3. GIFTS ⬤=49(4)—PAROL GIFT INTER VIVOS—REQUISITES.

Where there was a definite agreement that a father should give and a son should receive a gift of a particular tract of land, the boundaries of which were indicated with reasonable certainty to the satisfaction of both parties but to be fixed with absolute accuracy by a subsequent survey, the father renounced all claim to possession and control, and the son entered into possession claiming and holding the land as his own and built a dwelling thereon and made improvements, which, though small in actual value, were of substantial and peculiar value to one in his station and with his means, and it would operate as a fraud on him for his father or any one claiming under him to assert the legal title against the gift, the parol gift will be sustained.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 99.]

Dayton, District Judge, dissenting.

Appeal from the District Court of the United States for the Western District of Virginia, at Big Stone Gap; Henry Clay McDowell, Judge.

Suit by the Clinchfield Coal Corporation against A. J. Steinman for specific performance of an oral agreement to convey land. Decree for complainant, and defendant appeals. Affirmed.

R. T. Irvine, of Big Stone Gap, Va. (Irvine & Stuart, of Big Stone Gap, Va., on the brief), for appellant.

W. H. Rouse, of Clintwood, Va., and E. M. Fulton, of Wise, Va. (Fulton & Vicars, of Wise, Va., and Morison, Morison & Robertson, of Big Stone Gap, Va., on the brief), for appellee.

⬤=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

240 F.—36

Before KNAPP and WOODS, Circuit Judges, and DAYTON, District Judge.

WOODS, Circuit Judge. The appellant, A. J. Steinman, claiming under a conveyance dated December 18, 1874, made by Philip Fleming of all the coal, iron ore, and other minerals and fire clay in and under a tract of land containing 1,000 acres, brought an action of ejectment against the Clinchfield Coal Corporation for a tract of 54 acres, which was included in Philip Fleming's conveyance. The Clinchfield Coal Corporation then instituted this suit in equity alleging that John W. Fleming had acquired an equitable title to the land from his father, Philip Fleming, by a parol gift in 1870; and that it had acquired the title of John W. Fleming through successive conveyances. The relief asked in the bill was that Steinman be enjoined from prosecuting his legal action and that he be required to specifically perform the alleged agreement of Philip Fleming with his son, John W. Fleming, to convey the land. The decree of the District Court sustaining a demurrer to the bill was reversed by this court. 217 Fed. 875, 133 C. C. A. 585. The District Court held upon trial of the cause on the merits that the complainant had substantially proved the allegations of the bill, and granted the relief demanded.

In the effort to reverse the judgment, Steinman relies on these positions: (1) There was only a general understanding between Philip Fleming and his son John W. Fleming, revocable at the will of the father, and not a definite and certain contract that the son should have any land. (2) The contract or agreement, if any, was uncertain and indefinite as to the corners and boundary lines. (3) The acts proved as part performance were not done in pursuance of the agreement or with reference to it, and the possession of the son was not distinct from the father and was not defined by marked boundaries. (4) Even if the possession would have been sufficient between father and son, it was not such as gave a purchaser from the father notice.

The equitable principles applicable to the case, so frequently stated by the Virginia court, were set out in the opinion on the former appeal. They were thus clearly summarized by Judge Keith in McLin v. Richmond, 114 Va. 244, 76 S. E. 301:

" 'First, that the agreement relied on is certain and definite in its terms; second, that the acts proved in part performance must refer to, result from, or be made in pursuance of the agreement proved; and, third, that the agreement must have been so far executed that a refusal of full execution would operate a fraud upon the party and place him in a situation which does not lie in compensation.' Wright v. Pucket, 22 Grat. (63 Va.) 370; Plunkett v. Bryant, 101 Va. 818, 45 S. E. 742; Reed v. Reed, 108 Va. 790, 62 S. E. 792." East v. Atkinson, 117 Va. 490, 85 S. E. 468.

There was no substantial dispute as to the facts. Philip Fleming was the owner of a tract of land conveyed to him by Warders containing 2,008 acres. Before his transactions with his son John W. Fleming, and with Steinman, here involved, he sold 395.15 acres to Collier, 141.7 acres to Rose, and 505.1 acres to Phipps. The tract claimed by John W. Fleming as a gift made in 1870, for which a deed was made to him in 1878, contained 161.3 acres. At the date

of these transactions, all of the land referred to was wild mountain land, 40 or 50 miles from any railroad, and having little or no market value. The country was sparsely settled. Philip Fleming lived in a one-room cabin with his entire family. There was little communication between him and the outside world. The manners and customs were primitive, business transactions were few and conducted in a very loose and inartificial way. Little attention was paid to exact boundaries because of the small value of the land. The testimony of John W. Fleming concerning the alleged gift from his father was to this effect: When he was nearly 20 years old and about to marry, his father settled him on a tract of land, gave it to him, telling him pretty much how the lines would run. His father told him that he would make the deed as soon as he should get a surveyor and have the land surveyed. He settled on the land, built a small log house, cleared land from time to time, in all about nine or ten acres, and raised crops on it, planted an orchard, and used the land in all respects as his own. His father always spoke of it as his land and made no claim to it himself after the gift. He was urged by his father to have the land surveyed and the deed made so that his father could be relieved of the taxes on it and have them charged to him. Before he took the land, his father indicated the entire tract intended for him and his brother, Preston, and also in a general way the line of division between him and Preston. He was given choice as to the portion he would take. He did not go around the land with his father, but his father mentioned the particular trees he intended to mark the dividing line and indicated the land he was to take in this way:

"Starting from the beech coming around between me and Pres dividing the north mountain between us two it came around to the top of the ridge at the chestnut corner, giving me the heads of the hollows and Pres the bottom."

The testimony of John leaves no doubt that he and his father understood that the established Rose and Collier lines would be boundaries. His testimony tends to show, also, that they understood that the northern line, which is the line now claimed to be indefinite, would commence at the beech indicated by his father, which was the beginning corner of the Rose tract, and that they understood very nearly, if not accurately, just where it would come out on the ridge. It was understood that it was to go from that point to the Short Branch, which mean that it would go by the shortest distance. The objection to John's testimony was withdrawn; and it was corroborated by other witnesses who made more definite the location of the trees referred to by him and the boundaries intended, by their testimony as to the statements and conduct of Philip Fleming in their presence. To some of them he pointed out the trees intended to mark the boundary; he warned those cutting timber on the remainder of the land not to cross the line indicated by him as the boundary of John's land.

[1] The definiteness or reasonable certainty as to the land intended required to make valid a parol gift is relative. Definiteness and certainty in the description of a city lot may be a matter of feet; of arable and valuable agricultural land it may be a matter of a few acres or rods. In a wild mountain country among a primitive people where

the land has a nominal market value, a variation from absolute accuracy of a number of acres or of many rods may be negligible because a matter of indifference to the parties. The definiteness required is that everything of importance to the parties in the effect of the transaction should be expressed in the contract. The location or indication of a line varying from accuracy even by a number of rods ought not to be regarded vital when the parties themselves would have regarded it unimportant. Looked at in this practical way, there is no doubt that a surveyor going on the land could have made a line under the description of the lines and boundaries expressed by Philip Fleming to John W. that would have been unquestioned by either of them and that would have been regarded satisfactory by any party interested at the time. We think a surveyor could have made a practically accurate survey by the assistance of the other witnesses to whom Philip had indicated the location of the lines. The utmost result that lack of exactness in the description of the land would be that all doubts as to the exact location should be solved against John, the donee.

[2] There is no doubt that John had built and established a permanent home entirely distinct from that of his father, had cleared to the recognized line, and was using the land as his own. This was sufficient notice to Steinman, the purchaser from Philip. Chapman v. Chapman, 91 Va. 397, 21 S. E. 813, 50 Am. St. Rep. 846.

[3] To sum the case up, it was clearly proved that the father and son had a definite agreement that the former should make and the latter receive a gift of a particular tract of land; that the location and boundaries were indicated and understood with reasonable certainty to the entire satisfaction of both parties, the general location of one of the lines being indicated by trees named by the father to be fixed with absolute accuracy by a subsequent survey; that the father renounced all claim to possession and control, and the son entered into possession claiming and holding the land as his own in reliance on the gift; that the son established his home by building a dwelling, clearing and cultivating the land, some of the clearing being up to the line alleged by the defendant to be uncertain; that the improvements, while small in actual value, were of substantial and peculiar value to one in his station and with his means; and that it would operate as a fraud upon him for his father or anyone claiming under him to assert his legal title against the gift. The case is thus brought clearly within the principles laid down in the last deliverance of the Supreme Court of Appeals of Virginia in East v. Atkinson, supra.

To deny validity to such a parol gift as is here proved for indefiniteness or uncertainty would be giving such rigidity to rules of law as to deny equal justice to primitive and untutored people.

Affirmed.

DAYTON, District Judge. I am constrained to dissent. In the first place, the action of ejectment enjoined does not seek to recover the 54 acres of land, but only the coal and minerals underlying it. The right of John W. Fleming to hold or sell the surface thereof has

never been disputed. Both sides claim title from a common source. The legal title can be briefly outlined as follows:

Philip Fleming, the common source, on December 18, 1874, conveyed to J. D. Price and A. J. Steinman, for a consideration of $125, "all the bituminous and other coals, iron ore and all other minerals and fire clay" in and underlying a tract of 1,000 acres, fully bounded and described, with the usual rights to mine and remove the same. This deed was, on the day of its execution, duly admitted to record. On February 23, 1878, he "granted, bargained and willed" to his son John W. Fleming, for the consideration of one dollar, 169 acres of this tract. This deed was not admitted to record until January 28, 1887. It contained no reservation of the coal and other minerals previously sold and conveyed by him to Price and Steinman.

On January 29, 1887, the day after he recorded this deed from his father, John W. Fleming sold and conveyed 54 acres in fee of this 169 acres, for the consideration of one dollar per acre, to H. H. Willard of Cleveland, Ohio, who on February 28, 1887, sold and conveyed with mining rights, "all the coals, gases, minerals and oils" in and under 24 tracts including this 54-acre one, to F. A. Stratton of Tennessee. Willard sold these coals, etc., for a consideration of 75 cents an acre. The 24 tracts aggregated 7,193 acres. He did not sell the surface of the 54-acre tract in controversy. Stratton, in turn, conveyed these coals and minerals to the Virginia Mining & Improvement Company. This company mortgaged the same to the Boston Safe Deposit & Trust Company. The latter foreclosed the mortgage, sold and conveyed to Charles E. Hellier of Boston, who vested his rights in the Elkhorn Coal & Coke Company. The latter conveyed the same to the Cranes Nest Coal & Coke Company which, in turn, conveyed by deed of June 4, 1906, to the appellee, the Clinchfield Coal Corporation. The whole controversy is over this parcel of 54 acres, the legal title to which, as disclosed by the records, is clearly, so far as the surface is concerned, vested in H. H. Willard by virtue of his deed of January 29, 1887, for the fee from John W. Fleming, and so far as the coals and other minerals are concerned, in the appellant, Steinman, by virtue of his deed of December 18, 1874, from Philip Fleming to himself and Price; he claiming now to be the sole owner, although how he acquired Price's interest is not disclosed.

These facts are admitted. Steinman instituted ejectment against the Clinchfield Corporation for these coals and minerals. The latter filed this bill to enjoin the prosecution of this ejectment suit, and to secure and quiet its title to the coal and minerals underlying this 54 acres. To secure this relief, it alleges that, while Philip Fleming did not convey the 54 acres to his son John (under whom it claims its right) until 1878, and while he did in 1874 convey the coal underlying to Steinman and Price, nevertheless four years prior to this last conveyance he had orally given the land to his son John, who had then taken possession thereof, made valuable and permanent improvements thereon, of which gift, possession, and improvements Steinman and Price were bound to take notice. To this bill demurrer was interposed in the court below, sustained by it and overruled, upon appeal, by this

court. 217 Fed. 875, 133 C. C. A. 585. After this reversal, upon hearing on the merits, the court below sustained the bill, perpetuated the injunction, and vested the title to the coal and minerals in and under the 54 acres, in the Clinchfield Corporation. From this decree this appeal is taken by Steinman.

It goes without saying that the decision of this court upon the demurrer to the bill was governed by entirely different rules than those that must govern us in this hearing upon the merits. I think the allegations of the bill were specific enough, as to the oral gift, the boundaries of the land alleged to have been given, and the possession taken and the improvements made by the donee, to entirely justify the overruling of the demurrer; but I think, on the other hand, that the appellee has wholly failed in evidence, as to all these essential elements, to meet the requirements of equity necessary to warrant specific performance. Before considering the evidence, it would seem proper to briefly consider the origin of, and the rules governing, this equitable practice of upholding oral contracts of sale and gift of real estate in Virginia.

Under the Statute of Frauds, 29 Car. 11c 3, originating, it is said, with Lord Hale and another, the enforcement of such contracts is impossible, by reason of the seventh clause of the act, declaring:

"All declarations or creations of trusts or confidences in any land, tenements, or hereditaments, shall be manifested and proved by some writing signed by the party who is by law enabled to declare the trust, or by his last will in writing, or else they shall be utterly void."

This statute, being subsequent to St. 4 Jac. I, was never in force in Virginia, and its statute of frauds, first enacted in 1785, and all subsequent re-enactments, have omitted this seventh as well as the eighth and ninth clauses of the English statute and substituted therefor the words:

No action shall be brought * * * upon any contract for the sale of land, tenements, or hereditaments, or the making any lease thereof for a longer term than one year, or upon any agreement which is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized.

The struggle in Virginia courts to establish the doctrine that the "action" forbidden by this statute could be construed to mean actions at law, and that equity in certain exceptional cases of peculiar hardship, under limited conditions, could specifically enforce such oral contracts, was a long and bitter one, starting in 1800 with the case of Buck & Brander v. Copland, 2 Call (Va.) 218. A brief and defective recital of the controversy is given in Re Henderson (D. C.) 142 Fed. 568.

Possibly the best statement of the result, finally arrived at, is found in Wright v. Pucket, 22 Grat. (Va.) 370, 373, where the court says (italics mine):

"The statute of frauds was founded in wisdom and sound policy. Its primary object was to prevent the setting up of pretended agreements, and then supporting them by perjury. But besides these direct objects, there is a mani-

fest policy in requiring contracts of so important a nature as the sale and purchase of real estate, to be reduced to writing; since otherwise, from the imperfection of memory, and the honest mistakes of witnesses, it must often happen, either that the *specific* contract is incapable of *exact proof*, or that it is unintentionally varied from its original terms. The *statute, therefore, required in contracts of such nature as are therein mentioned more satisfactory and convincing testimony than mere oral evidence affords.* The wisdom of permitting any deviation from the terms of the statute has been questioned by the most eminent chancellors of England and of this country. Courts of equity, however, in their efforts to do complete justice and prevent fraud, have in certain cases relaxed the operation of the statute; and in cases where a parol agreement for the *sale* of land has been clearly and distinctly proved, and part performance in pursuance of the agreement established, a court of equity will decree specific execution."

Notwithstanding continued opposition, the equity courts of Virginia established the doctrine, first, that oral sales, and finally that oral gifts, could be specifically enforced under these conditions: (1) The parol agreement relied on must be certain and definite in its terms. (2) The acts proved in part performance must refer to, result from, or be made in pursuance of the agreement proved. (3) The agreement must have been so far executed that a refusal of full execution would operate a fraud upon the party, and place him in a situation which does not lie in compensation. Venable v. Stamper, 102 Va. 30, 35, 45 S. E. 738.

. The persistent opposition to the assertion of this power so assumed by the equity courts is illustrated by section 1, c. 116, p. 500, Va. Code 1849, which provided that:

"No estate of inheritance or freehold, or for a term of more than five years, in land, shall be conveyed unless by deed or will; and no gift of a slave or of any goods or chattels shall be valid, unless by deed or will, or unless actual possession shall have come to and remain with the donee, or some person claiming under him. If the donor and donee reside together at the time of the gift, possession at the place of their residence shall not be a sufficient possession within the meaning of this section."

·This section was amended and re-enacted in 1887, in these words:

"No estate of inheritance or freehold, or for a term of more than five years, in lands, shall be conveyed unless by deed or will, nor shall any voluntary partition of lands, by coparceners, having such an estate therein, be made, except by deed; nor shall any right to a conveyance of any such estate or term in land accrue to the donee of the land or those claiming under him, under a gift or promise of gift of the same hereafter made and not in writing, although such gift or promise be followed by possession thereunder and improvement of the land by the donee or those claiming under him." Pollard's Code 1904, § 2413.

It would seem fair to assume from this legislation that the people of Virginia, after more than 80 years' experience, concluded that, so far as gifts of real estate were concerned, equity's practice of enforcing oral contracts thereof operated to perpetuate fraud rather than prevent it, and by its legislation determined to forbid, hereafter, its exercise. This case impresses me as a striking illustration of the wisdom of this legislative conclusion. Here an alleged oral gift of land, charged to have been made by a father to his son in 1870, is sought to be enforced, as to the coal and minerals underlying 54 acres part thereof (which coal and minerals at that date were of a market value of not more than

12½ cents per acre, or $6.75), 43 years thereafter, not in favor of the original donee, but in favor of a coal corporation, which bought, after coal had become valuable, with full record evidence before it, that the alleged donor with no protest from the alleged donee had, in 1874, sold and conveyed the legal title to such coal to Steinman and Price. Is there to be no limitation to the enforcement of these contracts short of eternity?

Virginia does not stand alone in now forbidding their enforcement after full experience. Most of the states adopted the English statute of frauds including the seventh clause thereof, forbidding the enforcement of such contracts. The state of Pennsylvania was an exception until 1856, when it enacted this forbidding clause.

The legal deductions to be drawn may be summarized as follows:

(1) The common law does not recognize the doctrine and will not enforce it.

(2) The policy of Virginia legislation has been against it, resulting finally in absolute prohibition so far as gifts are concerned.

(3) The necessity of clear and convincing proof of each and every element required by equity in the administration of the doctrine is universally conceded. These elements relate:

First. To the character of the gift itself which must be (a) actual and complete, not conditional; and (b) it must be of a specific boundary, well defined, and not subject to confusion or misunderstanding. Wright v. Pucket, 22 Grat. (Va.) 370; Pierce's Heirs v. Catron, 23 Grat. (Va.) 588; Campbell v. Fetterman, 20 W. Va. 398; Lester v. Lester, 28 Grat. (Va.) 737; Blankenship v. Spencer, 31 W. Va. 510, 7 S. E. 433; Plunkett v. Bryant, 101 Va. 814, 45 S. E. 742.

Remembering that West Virginia adopted the Virginia statute of frauds and that many cases have arisen in that state touching the enforcement of these oral contracts, some of her decisions are very much in point as illustrating the definiteness of description of the land given, that is required. In Westfall v. Cottrills, 24 W. Va. 763, the contract was for "forty acres off the Spring fork end of my tract of 147 acres on Beech fork in Calhoun county." The description of the land was held to be too vague and indefinite. In Blankenship v. Spencer, 31 W. Va. 510, 7 S. E. 433, the claim was for "a certain piece of land containing 67½ acres, being the lower end of a certain survey sold and conveyed to S. by W., and adjoining lands of H. and of R., in the district of F., in the county of G., in the state of W. Va." The tract was shown in fact to contain 117 acres. Held:

"That the description of the boundaries of the 67½ acres, as described in said parol contract, is too vague and indefinite to authorize a court of equity to enforce the specific execution thereof."

Second. The possession required.

It must be actual, exclusive, open, and notorious. Woods v. Stevenson, 43 W. Va. 149, 27 S. E. 309; Miller v. Lorentz, 39 W. Va. 160, 19 S. E. 391.

It shocks the conscience, I submit, to hold that a father and son should be able, by means of this equitable doctrine, to enforce, against an innocent purchaser from the father afterward, a parol contract bas-

ed upon a slight possession of a few acres of a large boundary, of a thousand acres or more, of unimproved land upon which both reside, the son being at the time under age and only living apart on the land because he had married and the father's one-roomed cabin was too small to accommodate both.

Third. The improvements to be made.

(a) They should be substantial in character and both valuable and enduring.

(b) They should be put on the property by the son and donee, and not by the joint labor of the son and father. For the latter to be the case, rebuts, to a degree, the idea of complete surrender, by the father, of all interest in the land, and also of open, notorious, and exclusive possession by the son.

(c) They should be of such character as to be not well compensable in money damages. Griggsby v. Osborn, 82 Va. 371; Lightner v. Lightner (Va.) 23 S. E. 301; Trout v. Trout's Ex'r (Va.) 25 S. E. 98.

Fourth. The payment of taxes by the donee.

It is common experience that the method most generally resorted to by prospective purchasers to ascertain the owner and the extent and character of his possession and title, in Virginia and West Virginia, is by examination of the assessment land books of the county. To such an extent is this true, if John W. Fleming had run out and had his gift severed from his father's tract, placed it upon the land books, and caused it to be assessed to himself for taxation, and paid the taxes so assessed for any considerable number of years, this would have constituted the very best notice to the world of his claim of possession. Ever since the Acts of 1874–75, p. 219 (Code, 1904, § 458, c. 21), and I think long before that, the Virginia assessment law has required the commissioner before making out his land books, and at the time he takes the taxpayer's list of taxable personal property, to "carry with him the last land book that may be had, and the entry of lands charged to any person resident, or having an agent within his county, district or city, shall be shown to such person or his agent, who shall be required to state, on oath, whether the same be correctly entered; whether any part thereof ought to be transferred to any other person, and if so, to whom, and the nature of the evidence to authorize such transfer." Failure on the part of such commissioner to present such book to the taxpayer and on the part of the taxpayer to give such information are made finable offenses. Again: To sustain a parol sale of land under this doctrine, clear proof of the payment of the purchase price, or a substantial part thereof, is required. Necessarily in cases of gifts this element is wanting. The Virginia courts, it seems to me, have wisely, in effect, substituted for it the requirement that taxes should be paid by the donee, as set forth in Harrison v. Harrison, 36 W. Va. 556, and in Lightner v. Lightner, 23 S. E. 301, 2 Va. Dec. 258, where one of the reasons given for refusing to sustain alleged oral gifts by a father to his sons was the fact that the father had continued the payment of taxes after the alleged gifts had been made. This last-cited case is a very interesting one, and comes very near to paralleling many of the facts of this one.

Carefully analyzing the evidence in this case, it is clear that no specific boundary of land that Philip Fleming is claimed to have orally given his son John, was defined until after the survey was made and deed executed in 1878, four years after Philip had sold the coal to Steinman and Price; up to that time no mention or even guess of the number of acres to be given to John had been made. In this connection, it is to be noted that John did not even record his deed until 1887, when he undertook to sell and convey the 54 acres to Willard in fee, surface and coal together, for one dollar per acre. This was 13 years after the father had sold the coal to Steinman and Price. During all these years he never disclaimed or disavowed the father's right to sell the coal and minerals underlying either these 54 acres or the residue of the 169 acres which his father conveyed to him four years after such sale. This land lay in Dickenson county, west of the Alleghany Mountains, where, by section 2915 of the Va. Code (1904), no entry on, or suit to recover, land can be maintained after 10 years' adverse possession. While the question of adverse possession cannot directly arise here, it seems clear to my mind that by parity of reasoning the owner of the surface, if he disputes the legal title of the other party to the coal by reason of his having equitable title thereto by prior parol contract, should, by equitable proceedings, perfect such equitable title and secure the cancellation of the other's legal title to the coal as a cloud on his right, within 10 years after notice thereof, or be estopped from doing so; and this for the reason that he can take manual possession of his surface and by such possession perfect a defective title in ten years, while the owner of the title to the coal cannot take possession of surface or coal other and to a greater extent than his contract right to ingress and egress in and over the surface may give him.

The evidence shows that, in the primitive conditions existing in that locality in 1870, when this oral gift is alleged to have been made, it was the general custom of a father owning land, when a son married, to establish him on some part of his farm, with a view, if the boy was satisfied, he could reasonably expect the father, in future, either to deed or will to him the land; but, if not satisfied, he could leave (not sell) the land and go elsewhere and do for himself.

Larkin Stanley says, supplemental record top page 12:

"The rule among people was that, if the boys liked the land their father gave them and stayed on it, their father would make them a deed. If they did not make them a deed then, they would do so later. I don't know of any boy ever undertaking to sell the land or exercising ownership over it until after he got his deed. There was not much use."

## W. R. Reedy testifies:

"When a man gave his son a part of his home farm like this, started the boy on it, the boy could use his choice either to stay there if it pleased him or he could move off. Unless a boy got a deed from his father, he never undertook to sell the place or trade it like he owned it. As a general thing, he stayed and worked on it, and, when he would make a swop, he would generally get his father's consent. I don't think a father would give his son land like that and let him sell it without his consent; he would not want a neighbor thrust on him without his consent."

#### W. A. Stanley says:

"When Philip Fleming first told me how he had settled his children, including John W. Fleming, was along after Jack had married and Jack was on the land at the time. I don't know whether it was before or after December, 1874. It was along after Jack was living up there. Philip Fleming was a mighty good man, a good citizen, and highly regarded. He liked his fun and talked a good deal, but when it came to business he was straight. I do not think he was a man who would sell his minerals to a stranger and get money for it, when he had already given his land away to his son. I would be satisfied that he did not do anything like that."

#### Jefferson Fleming says:

"My father told me before I was married that I could pick me a piece of land, and when I wanted to go to work I could do so, and I made a choice of what is known as the Holly Creek Ridge and had two fields cleared. I was married January 12, 1871, and was 22 years old on the 17th of March following. My father said that he would give me the land I went to work on. I do not remember when he made me a deed for it, but he told us time and again that he was ready to make us a deed and we ought to have it surveyed and fixed up, and have the tract."

#### Again he says:

"He said: 'Boys, you had better have your land surveyed so that I can make you a deed; I am ready at any time.' We neglected, just like boys will. We never took things into consideration much. In time we did do it, got a surveyor, and had it run out.' He made it our duty to have it surveyed out; I don't know whether he put in the deed to John W. Fleming that he granted and willed him the land. He meant for us to have a home; I suppose he meant he was willing the land he made the deed to when he was still alive."

#### Again he says:

"My father expected John W. and Jeff to arrange and have their deeds made as soon as possible after they moved on their land. My father was a pretty hard worker and was a poor man, with right smart family. He had right smart taxes to pay and not much way to pay them. He says, 'Boys, you ought to have deeds so that you can lighten my taxes.'"

#### And John W. Fleming himself says his father told him:

"That I could get a surveyor to run it out, and that it would be a help to him about lightening the tax on him, and so on."

In view of this testimony, how can it be said that here was a contract certain and definite in its terms whereby the father had unconditionally parted with any specific number of acres of land prior to the survey and deed made in 1878? The boy, if he liked the location and was willing to stay, and his father naturally wanted him to do so, was to be deeded the land after it was surveyed out by the son and the specific boundaries had been agreed upon. Until that time the boy could not sell or dispose of it, but could give it up and leave it any time he desired. The conviction comes to me with great force that none of these illiterate people had ever heard of, or had the slightest idea, that a parol contract, either of sale or gift, could be made and sustained. On the contrary, I doubt not, the impression was universally prevalent that all contracts about land must be in writing. This view is clearly shown, I think, by the fact that the father, burdened with poverty and taxes, was urging his boys to have surveys made so as to define and make certain the quantity and boundaries of the lands

he was going to give them, in order that he might unload upon them a part of his burden of taxation. Yet, if he and his son John, in fact, regarded the oral contract, at the time, complete and not inchoate, both for eight consecutive years until the deed was made in 1878, violated the assessment law of the state in allowing the land to remain assessed in the father's name.

But it seems to me the alleged contract was not only inchoate, but to the last limit indefinite and uncertain. There is not a word in the evidence to show that a specific quantity in acres was talked about. The two sons were to have land off the father's large boundary, and it was to be divided by survey between them, whereby John was to have "the heads of the hollows and Pres the bottom." It is true that John testifies that his father did tell him "pretty much" how the lines would run, but he admits he "never went around the lines but looked at the place"; that he does not remember of knowing, before he moved on the tract, where "the sugar tree in the forks of Saw Pit Hollow," a prominent corner afterwards fixed by the survey, stood; that he "does not remember" that his father told him that this tree would be a corner to his tract; that he "just can't hardly tell" how far from the passway up that spur the first corner stood; that he did not know where the walnut corner over on Short Branch was "until the line was run." In answer to the question, "Now, when your father told you that he would give you that land up there, what was the first corner he said you would run to after leaving the big beech on the Elias Rose land?" he said, "I could not say." And to this question, "You knew about where your line would run from what he said?" he answers: "Yes, sir; but did not know where he would make the corners." Two questions arise here: First, how is it possible to fix and certainly define a boundary of land requiring a division line, without knowledge of a corner to start from; and, second, how could equity enforce a verbal contract, under its rules for definiteness, when all the corners and the division line had to be fixed by future agreement and survey?

But he goes on and admits that the division line between him and his brother Pres was never made until the survey and deed were made in 1878; that, if his father had "some corners or lines in mind, he did not tell him where they were." I further cite these questions propounded to him and his answers:

"You understood that you was to have the heads of the hollows, but you did not know how they would run? A. I had a good idea. He told me I would get all the heads of them as far as I would ever want to clear down the mountain. Q. Nothing said between you and your father about the coals and minerals under the land? A. No, sir. Q. That question you all never raised at all, did you? A. No, sir. Q. Neither you nor he regarded the coal worth anything? A. No, sir."

While the evidence is somewhat more persuasive as to the improvements made and possession taken, yet, to my mind, it wholly fails to meet the requirement of the rule. In the first place, in passing, it is to be noted from the testimony of John given above that no thought was given to the underground coal. The fact that the honest old father sold it afterwards may be taken to indicate that he did not, in 1870, intend to give it to his boys, and that the boys had no claim to it

by any oral contract. The possession given may well be limited to that of the surface. But let us put that aside and look at this possession of the surface. To my mind it was a family communistic, and not an individualistic one. The father lived in a single one-roomed log house. He had a family, of at least five or six, all living in this one room, independent of this boy John. John got married, and, though necessity, had to have a place for himself and wife to go. The father, two sons, and the neighbors got together and put up another one-roomed log house on the father's land for John. The outlay in money was nominal, in labor that of a few days. Jefferson, the brother, tells us how it was done, and the witness Reedy describes the character of the work and improvements. John did clear out eight or ten acres necessary to secure his living.

With full conviction that this whole proceeding was simply an afterthought, conceived by this Clinchfield Corporation to secure, contrary to the statute of frauds, the coal underlying this 54 acres, bought by it with full notice, through recorded deed, that such coal had been honestly bought and paid for by another some 40-odd years ago, I would reverse the decree of the court below and remand, with directions to dissolve the injunction and dismiss the bill.